**Marilyn GREASON, et al.,
Plaintiffs–Appellees,**

v.

**Ralph KEMP, et al.,
Defendants–Appellants.**

**No. 88–8563.**

United States Court of Appeals,
Eleventh Circuit.

Jan. 9, 1990.

Neal B. Childers, Cathy A. Cox, Asst. Attys. Gen., Atlanta, Ga., for defendants-appellants.

Joseph H. Chambless, Emmitte H. Griggs, Harriss, Watkins, Davis & Chambless, Macon, Ga., for Fodor.

Robert B. Remar, Susan M. Garrett, Remar & Graettinger, Atlanta, Ga., for plaintiffs-appellees.

Before TJOFLAT, Chief Judge, EDMONDSON, Circuit Judge, and ATKINS *, Senior District Judge.

TJOFLAT, Chief Judge:

This is an action for money damages. It was brought under 42 U.S.C. § 1983 (1982)[1] by the personal representatives of the estate of Charles Greason, a Georgia prison inmate who committed suicide while incarcerated. The plaintiffs claim that their decedent committed suicide because the defendants—the prison officials responsible for his custody and those who provided his mental health care—were deliberately indifferent to his psychiatric needs, in violation of his rights under the eighth and fourteenth amendments to the United States Constitution.[2] The defendants contend that, under the circumstances of this case, they are not answerable in money damages because they have qualified immunity. They presented this defense to the district court in a joint motion for summary judgment, arguing that the evidence before the court conclusively demonstrated that they had responded to Greason's psychiatric needs in a constitutional manner.[3] The court rejected their argument and denied their motion. The defendants then took this interlocutory appeal to obtain review of the court's ruling. We affirm.[4]

I.

The district court refused to grant the defendants summary judgment because the court was not prepared to hold, on the record before it, that the defendants were entitled to qualified immunity as a matter of law. In deciding whether the court erred, we take the record as it was presented to the district court and view it in the light most favorable to the plaintiffs. *See Waldrop v. Evans,* 871 F.2d 1030, 1034–35 (11th Cir.1989). Viewed in this light, the record reveals the following.

In early June 1985, Charles Greason, the plaintiffs' decedent, pled guilty but mentally ill to assault charges and was sentenced to prison for a term of five years.[5] After he was sentenced, Greason was taken to the Georgia Diagnostic and Classification Center (GDCC) for a mental health evaluation and any treatment that might be necessary.

Greason had a history of mental illness. He had recently been treated at the Gwinnett County Mental Health Center for depression and given anti-depression medication because he had contemplated suicide. Susanna Stoltzfus was Greason's

---

* Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

1. Section 1983 states, in pertinent part:

   Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

2. The eighth amendment proscribes the imposition of "cruel and unusual punishments." U.S. Const. amend. VIII. This proscription applies to the states through the fourteenth amendment. *Louisiana ex rel. Francis v. Resweber,* 329 U.S.

459, 463, 67 S.Ct. 374, 376, 91 L.Ed. 422 (1947). For convenience, we treat appellees' claim as having been brought under the eighth amendment.

3. The relevant evidence consisted mainly of depositions, affidavits, and medical records and reports.

4. This court has jurisdiction to review this interlocutory appeal under 28 U.S.C. § 1291 (1982). *See Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985) (denial of qualified immunity is appealable final order within meaning of 28 U.S.C. § 1291).

5. Greason was charged with aggravated assault for indiscriminately firing a rifle out of his bedroom window at a neighbor's house. No one was injured.

therapist at that facility. Upon learning of Greason's incarceration at the GDCC, she sent a letter to the clinical director there, R.T. Oliver, M.D., describing Greason's current mental status and relating his history of mental illness. In her letter, Stoltzfus noted that Greason had been hospitalized thirteen times at the Gwinnett County Mental Health Center during the ten years prior to his incarceration and that he had been diagnosed as a schizophrenic with suicidal tendencies. She therefore urged Dr. Oliver to continue Greason's anti-depression medication and to monitor him closely. Albert Duncan, Ph.D., the mental health director for the Georgia Department of Corrections, received the same advice from James Brooks, M.D., a psychiatrist with the Georgia Department of Human Resources, who had evaluated Greason before his transfer to the GDCC. In a formal report to Dr. Duncan, Dr. Brooks stated that Greason continued to have suicidal thoughts and needed to be maintained on his anti-depression medication. After these two reports were read, they were placed in Greason's clinical file.

Greason was kept at the GDCC for four months.[6] During that time, he was seen twice by the Center's psychiatrist, Frank Fodor, M.D., who was responsible for the evaluation and treatment of the mentally ill prisoners at the GDCC. Dr. Fodor came to the GDCC one day a week for six and one-half hours; during these visits, he saw as many as twenty-five to thirty inmates, spending, on the average, less than fifteen minutes per inmate.

The first time Dr. Fodor saw Greason was on August 22, 1985, two and one-half months after Greason's arrival at the GDCC. Dr. Fodor spent a few minutes with Greason and promptly concluded that Greason's condition had stabilized and that his anti-depression medication should be discontinued; he therefore discontinued Greason's medication without reviewing

Greason's clinical file or assessing his mental status to determine his current potential for suicide.

Calvin Brown, the mental health team leader at the GDCC, was the staff person responsible for Greason's case. Brown worked under Dr. Fodor's supervision; Fodor instructed him on the type of care Greason should receive, e.g., medication, counselling, or monitoring. Brown, in turn, kept Fodor apprised of Greason's progress, reporting to Fodor when Fodor made his weekly visits or more often if necessary.[7]

Following his August 22 visit with Greason, Dr. Fodor instructed Brown to discontinue Greason's anti-depression medication, but he did not tell Brown to monitor Greason for the adverse effects the discontinuance might produce. Dr. Fodor informed Dr. Oliver of his instruction to Brown; the information was contained in some cursory notes Fodor gave Oliver about his visit with Greason. Oliver put the notes in Greason's clinical file but took no other action. In particular, he did not direct Brown to monitor Greason.

Dr. Fodor's second, and final, visit with Greason occurred twenty-eight days later, on September 19. This session, like the first, lasted but a few minutes and was perfunctory. Dr. Fodor made no assessment of Greason's mental status and left no instructions with Calvin Brown. As before, Dr. Fodor made some cursory notes of his visit with Greason and left them with Dr. Oliver, who placed them in Greason's clinical file.

A few days later, Greason's parents visited him at the GDCC. Greason told them that since the discontinuance of his anti-depression medication, he had been unable to sleep, had been experiencing feelings of despair and thoughts of suicide, and on one occasion had attempted to kill himself by tying something around his throat.[8] They

6. During that time, Greason was kept in what was essentially solitary confinement; he was let out of his cell three times a week to take a shower.

7. Brown's duties included scheduling the inmates' appointments with Dr. Fodor.

8. Two inmates, Douglas Lewis and Billy Foraker, also reported to Brown that Greason had attempted suicide.

met with Brown following the visit, told him what their son had said, and urged Brown to have Greason transferred to a hospital, fearing that he might attempt suicide again.

Brown told Greason's parents not to worry about their son, that he would "take care of it." Brown, however, did nothing. He neglected to contact Dr. Fodor; consequently, Fodor had no knowledge of Greason's suicide attempt. Brown could have placed Greason on "a suicide watch," a procedure in which suicidal inmates are placed in stripped cells and subjected to around-the-clock observation, but he chose not to take this step. In sum, he made no effort to have Greason monitored.

On October 13, 1985, twenty-four days later, Greason was found dead in his cell; he had hung himself from the cell bars with his sweat shirt. The Greasons thereafter brought this action, seeking money damages against Calvin Brown and Dr. Fodor, those immediately responsible for providing Greason mental health care. The Greasons also sought damages from their superiors: Ralph Kemp and Dr. Oliver, respectively the warden and the clinical director of the GDCC, and Dr. Duncan, the mental health director of the Georgia Department of Corrections.

## II.

The doctrine of qualified immunity insulates government officials from personal liability for money damages for actions taken pursuant to their discretionary authority. In *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), the Supreme Court established the test for courts to use in determining whether, in a given case, such immunity is available. The Court said that "government officials ... generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* The appellants, here, claim that, as a matter of law, they met this test; accordingly, the district court should have granted them summary judgment. They ad-

vance two independent arguments in support of their position. First, the defendants argue that, at the time of Greason's suicide, prison inmates had no clearly established constitutional right to psychiatric care. Second, they argue that, even if such a right existed, reasonable persons, standing in appellants' respective shoes, would not have known that the conduct appellees challenge violated that right. We turn, now, to these arguments.

## A.

To decide whether, at the time of Greason's suicide, prisoners had a clearly established constitutional right to psychiatric care, we look to the law established by the Supreme Court, the courts of appeals, and the district courts. *See Harlow*, 457 U.S. at 819 n. 32, 102 S.Ct. at 2738 n. 32. We begin with *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), which was decided by the Supreme Court nearly a decade before the events in this case took place. In *Estelle*, the Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Id.* at 104, 97 S.Ct. at 291 (citation omitted). Because *Estelle* involved the provision of medical care rather than psychiatric care, however, the appellants in the present case argue that reasonable persons occupying their roles in a state prison system would not have known that *Estelle* condemned the type of conduct appellees complain of here.

■ The district court, in rejecting appellants' argument, stated:

From a strictly pragmatic perspective, the line separating traditional medical care from psychiatric treatment is blurred indeed, particularly in cases, such as the instant one, when psychotropic drugs are prescribed. Both a medical doctor practicing medicine and a medical doctor practicing psychiatry, such as Dr. Fodor, can prescribe these drugs, and the mere fact that a drug is prescribed by one as opposed to the other should not alone characterize the nature

of the treatment for Eighth Amendment purposes. Certainly any reasonably competent prison counselor or administrator, would realize that denying a prisoner needed psychotropic drugs might trigger liability under *Estelle*—just as any physician who declined to treat a gangrenous infection with antibiotics might reasonably expect a constitutional challenge. Even if this case involved failure to provide psychotherapy or psychological counselling alone, the court would still conclude that the psychiatric care was sufficiently similar to medical treatment to bring it within the embrace of *Estelle*.

This rationale has been used by other courts in disposing of cases involving the delivery of mental health care to prison inmates. In fact, every reported decision handed down after *Estelle* and before the events in this case occurred—i.e., the decisions that would have informed persons in appellants' positions as to the state of the relevant law—recognized that deliberate indifference to an inmate's need for mental health care is actionable on eighth amendment grounds. *See, e.g., Wellman v. Faulkner,* 715 F.2d 269, 272 (7th Cir.1983), *cert. denied,* 468 U.S. 1217, 104 S.Ct. 3587, 82 L.Ed.2d 885 (1984); *Hoptowit v. Ray,* 682 F.2d 1237, 1253 (9th Cir.1982); *Ramos v. Lamm,* 639 F.2d 559, 574 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759,

68 L.Ed.2d 239 (1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 763 (3d Cir.1979); *Bowring v. Godwin,* 551 F.2d 44, 47–48 (4th Cir.1977).[9] We accordingly hold that, at the time of Greason's suicide, reasonable persons in appellants' positions would have known that providing an inmate with inadequate psychiatric care could violate the inmate's eighth amendment right not to be subjected to cruel and unusual punishment.[10]

### B.

We now turn to appellants' argument that, even if legal precedent clearly established that the eighth amendment protects prison inmates from deliberate indifference to their psychiatric needs, reasonable persons occupying appellants' positions would not have known that the conduct complained of in this case constituted such indifference. To decide whether a reasonable person would have known—at the time of the challenged conduct—that what a particular appellant did amounted to deliberate indifference to Greason's needs, we must focus on what was apparent to that appellant when he acted. *See Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987); *see also Clark v. Evans,* 840 F.2d 876, 881 (11th Cir.1988). There are two discrete groups of appellants in this case; thus, in conduct-

---

**9.** We followed this precedent in a recent case involving Dr. Fodor. *See Waldrop v. Evans,* 871 F.2d 1030 (11th Cir.1989). In *Waldrop,* an inmate of the GDCC claimed that he suffered self-inflicted injuries because Dr. Fodor abruptly discontinued his psychotropic medication; he sued Fodor, alleging that the discontinuance of the medication constituted cruel and unusual punishment under the eighth and fourteenth amendments. Dr. Fodor contended that he was immune from suit because a psychiatrist's liability under the eighth amendment for deliberate indifference to an inmate's mental health needs had not been clearly established when the alleged misconduct occurred. We disagreed, finding that such liability had been recognized long before Dr. Fodor committed the act in question. *See id.* at 1033; *see also Rogers v. Evans,* 792 F.2d 1052, 1058 (11th Cir.1986) (deliberate indifference to prisoners' medical needs violates eighth amendment).

**10.** The dissent recognizes this proposition but argues that Greason could not have had a clear-

ly established constitutional right to have his medication continued because "no precedent existed that discontinuing psychotropic drugs under circumstances materially similar to these amounted to deliberate indifference." *Post* at p. 841. This argument fails for two reasons. First, one simply cannot say that a prisoner has a clearly established constitutional right to adequate psychiatric care but that that right is not violated by a particular treatment amounting to grossly inadequate care unless some prior court has expressly so held on "materially similar" facts. Such an approach would add an unwarranted degree of rigidity to the law of qualified immunity. Second, the argument fails because it ignores this court's holding in *Waldrop,* 871 F.2d at 1033, in which the court implicitly held, on virtually identical facts, that the prisoner had a clearly established right to have his psychotropic medication continued if discontinuation would amount to grossly inadequate psychiatric care.

ing our inquiry, we treat them separately. The first group consists of those who were directly responsible for Greason's psychiatric care—Dr. Fodor and Calvin Brown; the second group consists of those who were responsible for supervising them—Dr. Oliver, Dr. Duncan, and Warden Kemp.

### 1.

■ Turning to the first group, we begin by considering the case against Dr. Fodor. Dr. Fodor argues that a trier of fact might find that he had handled Greason's case negligently; it could not, however, find that he had been deliberately indifferent. His argument does not persuade us.

We have said that a trier of fact can conclude that one who provides grossly inadequate psychiatric care to a prison inmate is deliberately indifferent to the inmate's needs. *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir.1989). In this case, we believe that a trier of fact could find that Dr. Fodor provided such care and, moreover, that he realized that he was doing so at the time. As noted, after his first visit with Greason, which lasted but a few minutes, Dr. Fodor abruptly discontinued Greason's anti-depression medication. He did so without reviewing Greason's clinical file or conducting a mental status examination. Had he reviewed the file, Dr. Fodor would have discovered that Greason was a schizophrenic with an extensive history of mental illness and numerous hospital admissions for psychiatric treatment.[11] Moreover, he would have seen the reports from Stoltzfus and Brooks, which stated that without anti-depression medication, Greason would pose a substantial suicide risk. In short, Dr. Fodor would have realized that Greason would have to be monitored very closely if his medication were withdrawn.

There is expert opinion testimony in the record to the effect that Greason received grossly inadequate psychiatric care and that, from a professional point of view, Dr. Fodor handled his case in a grossly incompetent manner. To be sure, there is expert opinion testimony to the contrary that Dr. Fodor met the professional standards expected of a psychiatrist under the circumstances—or, at worst, was merely negligent—and that Greason received adequate care. The presence of such testimony, however, does not end the matter. In a nearly identical case, *Waldrop v. Evans*, 871 F.2d at 1035, we were faced with the same problem: conflicting expert opinion concerning the extent to which a psychiatrist may have departed from professional standards in abruptly discontinuing an inmate's psychotropic medication. We affirmed the district court's denial of the psychiatrist's motion for summary judgment, concluding that the conflict among the experts concerning the propriety of the psychiatrist's professional judgment calls had to be resolved by the jury. *Id.* at 1035; *see also Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir.1986) ("Whether an instance of medical misdiagnosis resulted from deliberate indifference or negligence is a factual question requiring exploration by expert witnesses."). In sum, because a jury could find (1) that Dr. Fodor provided grossly inadequate care and (2) that a reasonable person in Dr. Fodor's position would have known that the care delivered constituted deliberate indifference to Greason's eighth amendment rights, the district court acted correctly when it denied Dr. Fodor summary judgment.

We next examine the conduct of Calvin Brown, the mental health team leader at the GDCC. The question here is a narrow one: whether Brown's failure to monitor Greason after having been warned by Greason's parents and two inmates[12] that Greason had tried to commit suicide constituted deliberate indifference.

■ Where prison personnel directly responsible for inmate care have knowledge that an inmate has attempted, or even threatened, suicide, their failure to take

---

**11.** Appellants' expert witness, a psychiatrist, opined that Greason possessed a great number of the characteristics associated with a high suicide risk; for example, he was divorced, came from a lower socio-economic background, had limited education, had a history of alcohol abuse, and suffered a sense of failure.

**12.** *See supra* note 8.

steps to prevent that inmate from committing suicide can amount to deliberate indifference. *See Waldrop,* 871 F.2d at 1036 (failure of prison staff member, who was not a psychiatrist, to notify competent officials of inmate's dangerous psychiatric state can constitute deliberate indifference); *Edwards v. Gilbert,* 867 F.2d 1271, 1276 (11th Cir.1989) (stating in dicta that deliberate indifference standard is met if there is a strong likelihood that self-infliction of harm would result from failure to act); *Cabrales v. County of Los Angeles,* 864 F.2d 1454 (9th Cir.1988) (denying defendants' motion for judgment n.o.v. where jailers had rescued decedent from previous suicide attempt), *vacated,* — U.S. —, 109 S.Ct. 2425, 104 L.Ed.2d 982 (1989) (remanded for consideration in light of *City of Canton v. Harris,* — U.S. —, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)); *Partridge v. Two Unknown Police Officers,* 791 F.2d 1182 (5th Cir.1986) (plaintiff stated a valid claim where it was known that his decedent, a detainee, had attempted suicide in previous confinement); *Guglielmoni v. Alexander,* 583 F.Supp. 821 (D.Conn.1984) (defendants' motion for summary judgment denied where inmate had "faked" suicide by hanging then actually hung himself a month later); *Matje v. Leis,* 571 F.Supp. 918 (S.D.Ohio 1983) (defendants' motion for summary judgment denied where inmate's attorney told jail officials that inmate would attempt suicide by smuggling in drugs behind her diaphragm, and body cavity search was not performed). Because a jury could find (1) that Brown's conduct infringed Greason's eighth amendment right not to be subjected to grossly inadequate psychiatric care and (2) that a reasonable person in Brown's position would have known that his provision of care constituted deliberate indifference to Greason's eighth amendment rights, we conclude that the district court properly denied Brown's motion for summary judgment.

**13.** Under *Estelle* and its progeny, an inmate's eighth amendment rights are infringed by a prison official's deliberate indifference to the inmate's mental health care needs. *See supra* 891 F.2d at 833–34.

**2.**

Appellants Oliver, Kemp, and Duncan, the second group of appellants, contend that they cannot be held vicariously liable under 42 U.S.C. § 1983 (1982) for the acts of those they supervise. We recognize, of course, that supervisory personnel cannot be held liable under section 1983 for the acts of their subordinates under the doctrine of *respondeat superior, see Monell v. Department of Social Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978); *Hewett v. Jarrard,* 786 F.2d 1080, 1086 (11th Cir.1986); this, however, does not preclude an inquiry into whether the supervisors were independently liable under section 1983.

■ Using a negligence standard to determine a supervisory official's liability would result in de facto *respondeat superior* liability for the official, *cf. City of Canton,* — U.S. at —, 109 S.Ct. at 1206; therefore, the official is immune under *Harlow* unless a reasonable person in his position would know that his own conduct infringed a constitutional right of the plaintiff,[13] *see Creighton,* 483 U.S. at 641, 107 S.Ct. at 3040. Consequently, a supervisor can be held liable under section 1983 when a reasonable person in the supervisor's position would have known that his conduct infringed the constitutional rights of the plaintiff, *see Fowler v. Cross,* 635 F.2d 476, 484 (5th Cir. Jan.1981),[14] and his conduct was causally related to the constitutional violation committed by his subordinate, *see Wilson v. Attaway,* 757 F.2d 1227, 1241 (11th Cir.1985); *Hewett,* 786 F.2d at 1086–87 (citing *Barksdale v. King,* 699 F.2d 744, 746 (5th Cir.1983)). Thus, under *Estelle* and its progeny, courts must apply a three-prong test to determine a supervisor's liability: (1) whether, in failing adequately to train and supervise subordinates, he was deliberately indifferent to an inmate's men-

**14.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

tal health care needs;[15] (2) whether a reasonable person in the supervisor's position would know that his failure to train and supervise reflected deliberate indifference; and (3) whether his conduct was causally related to the constitutional infringement by his subordinate. Because a supervisor's orders and directions are tantamount to official policy in the eyes of a subordinate, we find the analogous situation of municipal liability under *City of Canton* to be helpful in determining whether a supervisor was deliberately indifferent to an inmate's psychiatric needs. In *City of Canton,* the Supreme Court held that a municipality can be liable for deficient training of city officials if the city's policymakers were deliberately indifferent to infringements of constitutional rights that are caused by lack of training and supervision. —— U.S. at ——, 109 S.Ct. at 1205.[16] We recently applied *City of Canton* in *Kerr v. City of West Palm Beach,* 875 F.2d 1546, 1555–57 (11th Cir.1989).[17] Although we are not here concerned with municipal liability, the analysis used in those cases is applicable to the case at hand, in which we must determine whether quasi-policymakers have been deliberately indifferent in their supervision of subordinates. Thus, as we explore the supervisors' conduct in this case, we will borrow from the Court's analysis in *City of Canton* and our analysis in *Kerr* to help determine whether the supervisors were deliberately indifferent to Greason's eighth amendment rights.

The determination of whether a supervisor was deliberately indifferent and whether that indifference was causally related to the constitutional violation [18] is a fact-sensitive inquiry. *See Waldrop,* 871 F.2d at 1034. Therefore, we consider Oliver's, Kemp's, and Duncan's conduct separately.

a.

As clinical director of the GDCC, Dr. Oliver was responsible for coordinating the provision of medical and psychiatric care at the GDCC. Additionally, Dr. Oliver was Dr. Fodor's immediate supervisor and reviewed all of Fodor's treatment notes.

The evidence suggests that Oliver, in his capacity as clinical director, knew about the severe lack of staff members capable of providing psychiatric care to the inmates. In deposition, Fodor stated that he complained to Oliver many times of inadequate staff and of his inability to spend sufficient time with the inmates. Apparently, Oliver did nothing in response to these complaints. Expert testimony in the record reveals that the number of staff members capable of providing psychiatric care was clearly inadequate, and a jury could find that a reasonable person in Dr. Oliver's position would be aware of the inadequacy. Fodor also complained to Oliver about the lack of an institutionalized mental health unit for inmates with severe emotional problems at the GDCC. Again, Dr. Oliver failed to take any action in response to these complaints. A jury could easily construe this failure to act as deliberate indifference to the eighth amendment rights of GDCC inmates.[19]

**15.** The same standard of deliberate indifference applies to both inadequate training and inadequate supervision. *Cf. Davis v. City of Ellensburg,* 869 F.2d 1230, 1235 (9th Cir.1989) (applying *City of Canton* to question of municipal liability).

**16.** In that situation, the Court held, the officials' conduct could be deemed the policy of the city.

**17.** *Kerr* involved the question of a municipality's liability for its police officials' alleged failure adequately to train police officers in the safe use of police dogs. *See Kerr,* 875 F.2d at 1546–53.

**18.** A causal connection can be established when, for example, the inmate's injuries result from the supervisor's failure to provide an adequate staff to administer medical or mental health care, *see Cabrales v. County of Los Angeles,* 864

F.2d 1454, 1461 (9th Cir.1988), *vacated,* —— U.S. ——, 109 S.Ct. 2425, 104 L.Ed.2d 982 (1989) (remanded for consideration in light of *City of Canton* ), or from the supervisor's promulgation of "haphazard and ill-conceived procedures," *see Todaro v. Ward,* 565 F.2d 48, 52 (2d Cir.1977). The required causal connection can also be established when a history of abuse by subordinates has put the supervisor on notice of the need for improved supervision and training, and his failure to take corrective action sets the stage for the inmate's injury. *See Fundiller v. City of Cooper City,* 777 F.2d 1436, 1443 (11th Cir.1985).

**19.** We have held that the political subdivision charged with maintaining the facility in question—here the State of Georgia—has a non-delegable duty to provide the funds necessary for

With regard to Greason in particular, a jury could find that Oliver's conduct constituted deliberate indifference. As Fodor's immediate supervisor, Oliver was aware of the Timothy Waldrop incident, which occurred at the GDCC almost one year prior to Greason's suicide, *see generally Waldrop v. Evans*, 871 F.2d 1030 (11th Cir. 1989). As in the Greason incident, Fodor had abruptly discontinued Waldrop's antidepressant medication. Shortly thereafter, Waldrop, an inmate, committed several acts of self-mutilation. *See id.* at 1032. Oliver regularly reviewed all of Fodor's treatment notes and knew that the acts of self-mutilation were preceded by Fodor's discontinuance of Waldrop's medication. In fact, Oliver took part in a meeting called after the incident to evaluate the treatment leading up to the acts of self-mutilation.

After having read Susanna Stoltzfus' letter, which warned of Greason's suicidal tendencies and recommended the continuation of his medication, Oliver was aware of Greason's precarious mental condition. Having read Fodor's notes, Oliver was also aware that Fodor had discontinued Greason's medication but had given Calvin Brown no specific instructions to monitor Greason. In fact, Oliver admitted that he did nothing in response to the Stoltzfus letter, apparently not even relaying its contents to Fodor or Brown.

■ We think that a jury could conclude that Oliver's conduct satisfied the three-prong test for determining a supervisor's liability, *see supra* at p. 836. Given Oliver's awareness of the Waldrop incident and its probable causes,[20] of the warnings from Susanna Stoltzfus, and of Fodor's method of treating Greason, a jury could conclude that Oliver acted with deliberate indifference toward Greason's eighth amendment rights in failing to ensure that competent officials took steps to protect Greason. As we have held, "failure to notify competent officials of an inmate's dangerous psychiatric state can constitute deliberate indifference." *Waldrop*, 871 F.2d at 1036. Furthermore, Oliver's failure to institute corrective procedures after the Waldrop incident could also be viewed as deliberate indifference. *Cf. City of Canton*, —— U.S. at —— n. 10, 109 S.Ct. at 1205 n. 10 (failure to take remedial action after plainly unconstitutional conduct by police officers could constitute deliberate indifference); *Kerr*, 875 F.2d at 1556 (jury could find that failure to take corrective action after plainly unconstitutional use of police dogs constituted deliberate indifference).

Under the second prong of the test, a jury could find that a reasonable person in Oliver's position would have known that his conduct reflected deliberate indifference to Greason's psychiatric needs. *Cf. Creighton*, 483 U.S. at 641, 107 S.Ct. at 3040. A jury also could find, under the test's third prong, that Oliver's conduct was causally related to the grossly inadequate psychiatric care that violated Greason's eighth amendment rights. We have held that when understaffing appears to have contributed to a violation of an inmate's eighth amendment rights, a causal link exists between that violation and the city's policy if officials are aware of the staffing problem but fail to take corrective action. *See, e.g., Anderson v. City of Atlanta*, 778 F.2d 678, 685–86 & n. 11 (11th Cir.1985); *see also Cabrales v. County of Los Angeles*, 864 F.2d 1454, 1461 (9th Cir.1988), *vacated*, —— U.S. ——, 109 S.Ct. 2425, 104 L.Ed.2d 982 (1989) (remanded for consideration in light of *City of Canton*). We think a reasonable jury could find such a causal link in this case. Furthermore, a jury could find that Oliver's failure to warn competent officials in light of Stoltzfus' letter and the

---

such maintenance. *See Ancata v. Prison Health Servs., Inc.,* 769 F.2d 700, 705 (11th Cir.1985). Therefore, if the supervisory officials can show that they attempted to remedy the staffing problems at the GDCC but were unable to do so because of lack of funds, then they can escape liability on this point. The record contains no evidence on this issue.

**20.** This awareness on the part of not only Oliver, but also Duncan and Kemp, separates this case from those cases involving only a single errant official and a single incident of errant behavior. *See, e.g., Merritt v. County of Los Angeles,* 875 F.2d 765, 770 (9th Cir.1989); *Rodriguez v. Avita,* 871 F.2d 552 (5th Cir.1989).

Timothy Waldrop incident was causally related to Greason's grossly inadequate psychiatric care.

Thus, because a jury could find that Oliver acted with deliberate indifference to Greason's eighth amendment rights, that a reasonable person would have known that Oliver's conduct constituted deliberate indifference, and that Oliver's conduct was causally related to the violation of Greason's eighth amendment rights, the district court acted correctly in denying the supervisory officials' motion for summary judgment with respect to Oliver.

### b.

■ Dr. Duncan, at the time of Greason's suicide, held the position of director of mental health for the Georgia Department of Corrections. As mental health director, Duncan was responsible for ensuring that all mental health programs were properly implemented at all institutions, including the GDCC.

The record reveals that Duncan was aware of many conditions at the GDCC that could lead to grossly inadequate mental health care. Duncan knew, for example, that many of the inmates did not receive enough recreation time, and he admitted that lack of recreation could be damaging to an inmate's mental health. In fact, the record reveals that Greason was allowed out of his cell for recreation only eight times during his entire stay at the GDCC.

Duncan was also aware that mental health treatment plans—systematic and organized treatment of an inmate—were used at other Georgia facilities, but not at the GDCC. Fodor stated that such a plan would have been very beneficial to Greason, and expert testimony suggested that such a plan was necessary for adequate care. Furthermore, Duncan knew that the GDCC had no policies or procedures designed to help the staff and guards recognize suicidal tendencies and prevent suicide attempts. Finally, Duncan was aware of the excessive burden on Fodor and admitted that Fodor could not adequately treat all of the inmates requiring mental health care. Fodor often complained to Duncan, as he did to Oliver, about the severe lack of staff members and the need for a mental health care unit at the GDCC.

With regard to Greason in particular, Duncan received and reviewed the Brooks report, which recommended that Greason's medication be continued. Duncan was also very much aware of the Waldrop incident, having authorized and conducted a review of it, and therefore was aware of what could result from the abrupt discontinuation of medication. Nevertheless, he failed to take any action to ensure that Brooks' advice for Greason would be implemented or that no reckless discontinuation of medication would occur.

In light of all the major problems at the GDCC of which Duncan was aware but which he apparently did not attempt to remedy, we have no difficulty in holding that a reasonable jury could find that Duncan satisfied the three-prong test for supervisory liability. A jury could reasonably find (1) that Duncan acted in deliberate indifference to Greason's eighth amendment rights, *see Waldrop*, 871 F.2d at 1036; *Anderson*, 778 F.2d at 685–86 & n. 11; *cf. Kerr*, 875 F.2d at 1556; (2) that a reasonable person in Duncan's position would have known that his conduct constituted deliberate indifference; and (3) that this conduct was causally related to the grossly inadequate care provided to Greason. Thus, we find no error in the district court's refusal to grant summary judgment in favor of Duncan.

### c.

■ Ralph Kemp occupied the position of warden of the GDCC at the time of Greason's suicide. As warden, Kemp was responsible for ensuring that all services at the GDCC were properly provided.

Kemp, in deposition, denied knowing the precise number of inmates that Fodor saw on a typical visit. He was, however, aware that approximately seventy to seventy-five inmates required mental care at the time and that Fodor visited the facility only once a week. Even if Kemp was unaware of the excessive burden on Fodor, Kemp was the person charged with ensuring the provision

of services at the GDCC and was primarily responsible for staffing the GDCC; he therefore "should have been aware" of the understaffing and its "attendant problems," *Fowler v. Cross*, 635 F.2d 476, 484 (5th Cir. Jan.1981). The record, though, does not indicate that Kemp attempted to remedy this problem.

Furthermore, Kemp was familiar with the Waldrop incident and knew that Waldrop's medication had been discontinued prior to the acts of self-mutilation. Kemp, however, did nothing to investigate Waldrop's treatment or to change the method of treatment after the incident. Nor did Kemp ever question Fodor; as he stated in deposition, Waldrop "was under the care of Dr. Fodor, and that was good enough for me."

We find that Kemp was aware of the same essential facts that were also apparent to Oliver and Duncan.[21] Therefore, we hold that a reasonable jury could conclude from the evidence in the record before us (1) that, because Kemp failed to take adequate measures to cure the serious problems of which he was aware, he was deliberately indifferent to Greason's eighth amendment right to psychiatric care, *see Anderson*, 778 F.2d at 685–86; *cf. Kerr*, 875 F.2d at 1556–57; (2) that a reasonable person in Kemp's position would know that his conduct constituted deliberate indifference; and (3) that, because Kemp was in a position to rectify (or attempt to rectify) most of these serious problems, his failure to do so was causally related to the violation of Greason's eighth amendment rights. The district court therefore acted properly in denying Kemp's motion for summary judgment.

d.

In sum, we hold that a jury could reasonably find that the conduct of the three supervisory officials satisfied the three-part test for supervisory liability articulated above. In light of the supervisory officials' conduct as detailed above, we hold

that (1) the evidence could support a finding that the conduct reflected a deliberate indifference to Greason's eighth amendment right to adequate mental health care; (2) the officials should have known their conduct constituted deliberate indifference to a clearly established constitutional right, *cf. Creighton*, 483 U.S. at 641, 107 S.Ct. at 3040; and (3) the conduct was causally connected to the violation of Greason's eighth amendment rights. Whether the conduct *actually* constituted deliberate indifference and was causally related to the violation of Greason's eighth amendment rights is a factual question that will likely require exploration by expert witnesses at trial. *See Waldrop*, 871 F.2d at 1035. A contested factual issue having been established, the district correctly denied the supervisory officials' motion for summary judgment.

III.

We affirm the district court's order denying appellants' motion for summary judgment on the issue of qualified immunity.

AFFIRMED.

EDMONDSON, Circuit Judge, dissenting:

Even in cases involving the practice of medicine, qualified immunity does not hinge on legal generalities. Both this court and the Supreme Court have stressed repeatedly that the law defining a constitutional tort must be clearly enough established to make it "apparent" to a potential defendant that "what he is doing" is unconstitutional. *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) ("[T]he right the official is alleged to have violated must have been 'clearly established' in a particularized, and hence more relevant, sense."); *see Malley v. Briggs*, 475 U.S. 335, 341–44, 106 S.Ct. 1092, 1096–97, 89 L.Ed.2d 271 (1986); *Edwards v. Gilbert*, 867 F.2d 1271, 1273 (11th Cir.1989); *Dartland v. Metropolitan Dade County*, 866 F.2d 1321, 1322–23 (11th Cir.

---

**21.** Kemp also knew that the inmates received inadequate recreation time and that the guards

lacked training in suicide prevention.

1989); *Barts v. Joyner,* 865 F.2d 1187, 1190 (11th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 101, 107 L.Ed.2d 65 (1989); *Clark v. Evans,* 840 F.2d 876, 880, 881 (11th Cir. 1988); *Muhammad v. Wainwright,* 839 F.2d 1422, 1424 (11th Cir.1987). "The line between the lawful and the unlawful is often vague. *Harlow's* 'clearly established' standard demands that a bright line be crossed. The line is not to be found in abstractions—to act reasonably, to act with probable cause, and so forth—but in studying how these abstractions have been applied in concrete circumstances." *Barts,* 865 F.2d at 1194 (footnote omitted).

At the time of Charles Greason's suicide in 1985, the law was clear that deliberate indifference to an inmate's serious psychiatric needs could lead to a violation of that inmate's eighth amendment rights. I disagree, however, that in 1985 it had already been clearly established that to do as defendants did—mainly, diagnose that Greason no longer needed psychotropic drugs—would amount to deliberate indifference, violating the Constitution. In 1985, no precedent existed that discontinuing psychotropic drugs under circumstances materially similar to these amounted to deliberate indifference.[1] The existence of an inmate's constitutional right not to be subjected to the cruel and unusual punishment that results from deliberately indifferent psychiatric care is not meaningless just because qualified immunity protects defendants in particular circumstances from the inmate's claim for damages. Qualified immunity does not bar all judicial remedies, *e.g.,* injunctive or declaratory relief and damages against defendants other than individuals who violate the Constitution.

Moreover, today's court denies immunity to the supervisors in this case by using a three-part test never before applied by this or any other court for an eighth amendment violation based on inadequate health care alleged against prison officials who were not directly responsible for a prisoner's psychiatric care. Although the test seems appropriate, it is a fiction to say that the law applied to the supervisors to deprive them of immunity was clearly established in the eighth amendment healthcare context in 1985. The law on point is being established today.

I also disagree with the court's suggestion that defendants in this case are unentitled to immunity because a jury could find a constitutional violation from the facts presented. Under this analysis, qualified immunity would be available in only those cases in which a jury could not find a constitutional tort. In such cases, however, the Constitution has not been violated and no liability exists. Immunity contemplates exemption from liability that would otherwise exist on the merits; today's court seems to suggest that immunity is available in only those cases in which the doctrine is superfluous.

The merits of plaintiff's case and the question of qualified immunity are sepa-

---

1. The cases cited in today's court opinion hold only that an inmate is entitled to reasonable access to medical personnel who can provide necessary psychiatric care. *See Bowring v. Godwin,* 551 F.2d 44, 47–48 (4th Cir.1977) (court expressly disavowed any attempt to second-guess the adequacy of any particular course of treatment); *see also Wellman v. Faulkner,* 715 F.2d 269, 272 (7th Cir.1983); *Hoptowit v. Ray,* 682 F.2d 1237, 1253 (9th Cir.1983); *Ramos v. Lamm,* 639 F.2d 559, 574 (10th Cir.1980); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 763 (3d Cir.1979).

*Waldrop v. Evans,* 871 F.2d 1030 (11th Cir. 1989), held that qualified immunity might be unavailable to physicians who withheld from an inmate psychotropic drugs, including Lithium, which had been used to control successfully the inmate's mental illness: within three weeks after discontinuance of the drugs, the inmate performed four separate acts of self-mutilation over a period of 40 days and the physicians, with knowledge of these self-destructive acts, never reinstituted use of Lithium in an attempt to stablilize and to control the inmate's condition. The *Waldrop* court could hold only that what the defendants did in that case was, at the time, clearly established to violate the Constitution. Because today's case involves materially different facts—defendants other than the inmate's attending physician, no series of self-inflicted physical injuries following the decision to stop medication, and no notice to any of the prison doctors that Greason had attempted suicide (if in fact he had done so) since being removed from the drugs—*Waldrop* cannot control the issue of whether the law was clearly established that what defendants did in this case was at the time unconstitutional.

rate questions; we must avoid allowing the ideas to become blurred. On summary judgment, affidavits showing that medical experts disagree about the adequacy of the care provided might create a triable issue on the merits, but do not create a triable issue on qualified immunity. Defendants do not lose their immunity because of conflicting opinion evidence about whether they were deliberately indifferent. To the contrary, qualified immunity is warranted in an eighth amendment case when independent medical experts disagree about whether defendants' conduct was deliberately indifferent. *Cf. Clark,* 840 F.2d at 881 (prison guard who shot escapee granted immunity despite conflicting opinion evidence about whether lethal gunfire was justified in the circumstances); *Edwards,* 867 F.2d at 1275–76 (sheriff and correctional officer granted immunity in juvenile inmate's suicide where opinion evidence conflicted as to whether officials had properly monitored juvenile).

Nowadays, most section 1983 litigation involves expert testimony stating an opinion about whether the state officer was "reasonable" or used "excessive force" or was "deliberately indifferent." Qualified immunity is intended to protect public officers not just from adverse judgments, but also from the burden of being entangled in litigation and defending themselves. *See Harlow v. Fitzgerald,* 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982). To allow qualified immunity to be defeated (so that a trial must be had) by the simple expedient of producing an expert's affidavit stating an opinion on the ultimate merits adverse to the public officer, is to destroy much of what the doctrine of qualified immunity is intended to do. Even if medical decisions are involved in a case, I think this cannot be the law.

To avoid trivializing the eighth amendment, we must guard against confusing or allowing others to confuse malpractice with a violation of the Constitution. Whether a healthcare worker's conduct amounts to deliberate indifference so that the eighth amendment is violated is a factually sensitive issue depending on a case-by-case analysis: medicine is a delicate blend of art and science not easily measured by hard and fast rules. Therefore, rarely will a

basis exist for an *a priori* judgment that a healthcare worker was deliberately indifferent and thus violated clearly established rights. *Cf. Dartland,* 866 F.2d at 1323. Put differently, qualified immunity will likely shield most healthcare workers from damages in their individual capacities even if a jury could find that the level of care given amounted to deliberate indifference.

Where, as here, no case law existed in 1985 which in a particularized way made it apparent that defendants' acts would amount to deliberate indifference and where competent medical evidence exists that in 1985 defendants' actions were not deliberately indifferent, defendants are immune from damages. I would reverse the denial of summary judgment.