Paula JOHNSON, Plaintiff

v.

**SCHOOL UNION # 107,**
**et al., Defendants**

**No. CIV. 03–84–B–K.**

United States District Court,
D. Maine.

Dec. 11, 2003.

Wayne P. Doane, Law Office of Wayne Doane, Exeter, ME, for Paula Johnson, Plaintiff.

Melissa A. Hewey, Drummond, Woodsum & MacMahon, Portland, ME, for School Union 107, Princeton School Department, Defendants.

## MEMORANDUM OF DECISION [1]

KRAVCHUK, United States Magistrate Judge.

Paula Johnson is pursuing this removed action against the Princeton School Department and School Union # 107 alleging that she was the victim of discrimination when her teaching contract was not renewed because she was pregnant. The defendants have filed a motion for summary judgment. (Docket No. 8.) I now **GRANT** the motion with respect to the claims against School Union # 107 and **DENY** this motion as to Johnson's claims against the Princeton School Department.

### Statement of Material Facts

Defendant Princeton School Department is one of seven community school districts that make up Defendant School Union # 107. Princeton School Department has 25 employees. In the fall of 1997, a vacancy arose in a Princeton Elementary School third grade teaching position. Plaintiff Paula Johnson filled the position for the remainder of the 1997–1998 school year as a long term substitute teacher. At the conclusion of the school year, the Department advertised the position and Johnson applied to fill it. The Department extended offers to two other applicants ahead of Johnson, but subsequently awarded the position to Johnson when those individuals declined the position. Johnson signed a one-year probationary contract. Edwin B.

McLaughlin, Superintendent of Schools for School Union # 107, also signed the contract.

Johnson's first year as a probationary third-grade teacher (1998–1999) was marked by some classroom management issues, which improved as the year went on. Kathy LaPlante, a member of the school board, testified that she heard certain second-hand reports about noise emanating from Johnson's classroom. Nevertheless, the board awarded Johnson a second probationary contract for the 1999–2000, which was once again executed by Johnson and Superintendent McLaughlin. At the time the contract was awarded, Johnson was pregnant and due to deliver on August 15, 2000. She informed Principal Barry Wheaton that she would need six weeks after the birth before returning to teaching. Principal Wheaton did not appear upset by this information, but stated, according to Johnson, that the timing was bad because it was likely to overlap with the start of the school year. Johnson states that Principal Wheaton also inquired of the due date and indicated that he wanted to know in case the board asked about it.

When Johnson returned to the classroom, Principal Wheaton no longer worked at the school and a new Principal, Nicole Goodspeed, Ph.D., f/k/a Robertson, had taken over. Principal Goodspeed conducted an observation/evaluation of Johnson on October 16, 2000. In it she noted that Johnson's classroom was a mess, the majority of students were off task, students talked without raising their hands, students spent five or more minutes in the bathroom during the lesson, Johnson

---

1. Pursuant to 28 U.S.C. § 636(c), the parties have consented to have United States Magistrate Judge Margaret J. Kravchuk conduct all proceedings in this case, including trial, and to order entry of judgment.

seemed oblivious to the distractions and had to stop the lesson several times to wait for students to quiet down, and students were facing the back of the room and talking to Principal Goodspeed instead of paying attention to Johnson. Principal Goodspeed also described Johnson's lesson that day as choppy and disorganized. Principal Goodspeed concluded that Johnson was eager to teach but had classroom management problems that were of concern. During the fall of 2000, Principal Goodspeed also received complaints from other teachers and staff concerning Johnson's classroom management. On October 23, 2000, Principal Goodspeed met with Johnson and gave her some suggestions for improving her classroom management. On November 1, 2000, Principal Goodspeed told Johnson that her classroom management had improved and gave her additional suggestions for speaking with disruptive students. In an "observation review" dated January 23, 2001, Principal Goodspeed noted further improvement in Johnson's classroom management, including an evaluation that she considered Johnson to have demonstrated good classroom management and a commendation to "keep up [the] good teaching [and] work." In an observation review conducted on March 21, 2001, Superintendent McLaughlin recorded that Johnson's classroom was neat and organized and that the students were behaving appropriately and participating well in their lessons.

At some point over the next few months, the issue of Johnson's contract arose and Principal Goodspeed recommended that Johnson receive a continuing contract. She did so based on Johnson's improvement in the area of classroom management and former Principal Wheaton's strong support. Superintendent McLaughlin accepted the recommendation and nominated Johnson for a continuing contract before the school board on May 9, 2001. In a May 7, 2001 letter, Superintendent McLaughlin informed Johnson that the recommendation was "an indication of the confidence in you by both your principal and myself." The school board at that time consisted of the following five members: Cathy Cilley, Joanne Dolan, Kathy LaPlante, Tonya MacArthur and Vernon Wentworth (chair). Only Wentworth voted in favor of the Johnson nomination.

Defendants offer that two of the five board members (Cilley and LaPlante) were unaware that Johnson was pregnant when they cast their votes. I infer from this that the other three were aware of Johnson's pregnancy prior to the May 9, 2001 vote.[2] During their depositions, Cilley and LaPlante testified that they had been unaware that Johnson was pregnant at the time they cast their votes. According to Johnson, however, her pregnancy started showing in February 2001. During the months of February, March, April and May LaPlante would see Johnson at the school roughly every two weeks. Cilley, on the other hand, testified that she had never even seen Johnson prior to the vote. Johnson now asks that an inference be drawn that Cilley knew of the pregnancy because Cilley worked with MacArthur

---

**2.** Additionally, Johnson offers statements of fact from which I might separately infer that Dolan and MacArthur were aware of Johnson's pregnancy. Dolan saw Johnson at church on a regular basis and MacArthur saw Johnson at the school when dropping off or picking up her children. However, I need not consider those facts (although the ultimate factfinder might consider them relevant is assessing the Cilley and LaPlante denials) because Defendants' Statement of Undisputed Material Facts, ¶¶ 36–37 does not assert that MacArthur and Dolan did not know of the pregnancy. (Compare to ¶¶ 31 & 33, describing Cilley and LaPlante's lack of knowledge).

at Head Start and it is uncontested that MacArthur knew Johnson was pregnant.

When asked at her deposition for the reasons why she voted against giving Johnson a continuing contract, Cilley indicated that she felt Johnson had not demonstrated sufficient "growth" in her ability to provide "discipline and guidance." According to Cilley, she received complaints from two people prior to the May 9, 2001 vote on Johnson's contract. As it turns out, both of these individuals have familial or business relationships with Cilley. Cilley acknowledged that she neither reviewed any evaluations of Johnson nor visited her classroom prior to the May 9, 2001 vote. For her part, LaPlante indicated that she was not "happy with" Johnson's work. Like Cilley, LaPlante acknowledged that she neither reviewed any evaluations of Johnson nor visited her classroom. LaPlante did recall hearing Principal Goodspeed indicate in the fall of 2000 that Johnson's classroom management skills "were improving." LaPlante indicated that she was not concerned about Johnson's prior pregnancy or that it had caused Johnson to miss the start of the 2000 school year. On the other hand, LaPlante described the leave benefit Princeton affords to pregnant teachers as "more than we have to give" and also indicated as one reason for voting against Johnson's continuing contract the fact that Princeton Elementary is a "poor school."[3] Dolan, the third board member who voted against giving Johnson a continuing contract, testified that she had done so based, essentially, on the fact that Johnson had required some oversight and mentoring during her two probationary contracts and did not deserve a continuing contract. Like Cilley

and LaPlante, Dolan never visited Johnson's classroom to observe Johnson's classroom management. Dolan did, however, have some personal insight into Johnson's classroom. Her son had attended Princeton Elementary and had Johnson as a third-grade teacher. Dolan never raised any concern at that time about Johnson's ability to effectively teach. The fourth and final board member to vote against the continuing contract was Tonya MacArthur. Her explanation for her vote is not easy to tease out. The deposition testimony cited by the parties reflects that MacArthur made contradictory indications that, on the one hand, she "never talked to the school board members or anybody about this at all" and, on the other hand, that the evidence she based her decision on was the evidence she "learned about through the other board members." Ultimately, MacArthur offers only that she "voted the way [she] felt needed to be voted for the children in Princeton."

The board's vote was unpopular with several members of the community. A petition was circulated and signed by some 63 individuals requesting that the board reconsider its decision and give a continuing contract to Johnson. At a June 13, 2001 board meeting Johnson made a presentation to the board before a loud crowd of spectators, some of whom also addressed the board in favor of Johnson. Following the public comment, the board reconvened in another room and Wentworth, the board chair, made a motion to reconsider, which failed for want of a second. After Johnson's provisional contract expired, her position was filled with a non-pregnant teacher. Prior to the commence-

---

**3.** It is not apparent from LaPlante's deposition testimony how the fact of Princeton's limited financial resources related to LaPlante's vote on Johnson's continuing contract. The parties agree, however, that ma-

ternity leave for a teacher requires the school department to continue to pay that teacher benefits while at the same time paying a substitute teacher for the period of the leave. (Pl.'s Additional S.M.F. ¶ 44).

ment of adversarial proceedings, the board provided no explanation to Johnson or to the public for its decision to deny Johnson a continuing contract.

## Discussion

■ Summary judgment is warranted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Johnson's complaint recites two counts. The first alleges that she was denied the continuing contract with Princeton Elementary because she was pregnant, in violation of the Maine Human Rights Act, 5 M.R.S.A. § 4572. The second alleges the same pregnancy discrimination but is premised on Title VII, 42 U.S.C. §§ 2000e–2(a)(1), 2000e(k).[4] It is generally recognized that the same standard applies to both counts, *see, e.g.,* *Green v. New Balance Athletic Shoe,* 182 F.Supp.2d 128, 135(D.Me.2002) (citing *Braverman v. Penobscot Shoe Co.,* 859 F.Supp. 596, 606 (D.Me.1994) and its interpretation of the Maine Human Rights Act consistent with analogous federal discrimination law), and Johnson had not suggested otherwise.

[U]nder Title VII ... an employer may not discharge an employee based on the categorical fact of her pregnancy. By the same token, since a short-term ina-

bility to work is bound up with the very nature of pregnancy and childbirth, that disability is a pregnancy-related condition within the meaning of 42 U.S.C. § 2000e(k), and Title VII thus prohibits an employer from dismissing an employee in retaliation for taking an authorized maternity leave.

*Smith v. F.W. Morse & Co.,* 76 F.3d 413, 424 (1st Cir.1996) (citation omitted). Unless a plaintiff has direct evidence of discriminatory motive on her employer's part, a summary judgment motion that seeks to dispose of a discriminatory discharge claim must be determined according to the so-called *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, the plaintiff must demonstrate that she has a "prima facie case." *Id.* at 802, 93 S.Ct. 1817.[5] If she succeeds, the burden shifts to the defendant to produce evidence of a legitimate, non-discriminatory justification for discharging the plaintiff. *Id.* at 802–803, 93 S.Ct. 1817. If it fails to do so, summary judgment may not enter for the defendant. If, however, the defendant carries this burden of production, the onus returns to the plaintiff, who must ultimately provide evidence capable of exposing the defendant's stated justification as a mere pretext for discrimination. *Id.* at 805, 93 S.Ct. 1817. If the plaintiff cannot produce such evidence, summary judgment must enter against her claim. But if plaintiff carries

---

4. As the First Circuit Court of Appeals recently explained:

   In 1976, the Supreme Court held that discrimination on the basis of pregnancy was not gender-based discrimination within the meaning of Title VII. Congress reacted to this decision, amending the definition section of Title VII [§ 2000e(k) ] such that its prohibition of discrimination on the basis of sex encompassed pregnancy discrimination.

   *Laro v. New Hampshire,* 259 F.3d 1, 14 (1st Cir.2001) (citation and footnote omitted).

5. In the context of this case, Johnson would carry this burden by producing evidence demonstrating (1) that she was pregnant at the time the adverse employment decision was made, (2) that her job performance was satisfactory, (3) that the employer nonetheless dismissed her from her position (or took some other adverse employment action against her), and (4) that the employer filled her position with a comparably qualified person. *F.W. Morse & Co.,* 76 F.3d at 421.

this burden, then she is deemed to have generated a genuine issue of material fact on the existence of discriminatory animus and, accordingly, summary judgment may not enter and the case must proceed to trial. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 153, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *F.W. Morse & Co.*, 76 F.3d at 420–21; *Green*, 182 F.Supp.2d at 135.

### 1. Discrimination Claims

In their motion for summary judgment, the defendants as much as concede that Johnson has met her initial burden, and then proceed to take up their burden. The explanation they present is that Johnson was denied a continuing contract because of the classroom management issues that arose while she was a probationary teacher. In the defendants' words, Johnson "simply was not a good enough teacher to deserve lifetime tenure at their school." (Defs.' Mot. Summ. J. & Mem. at 8.) Cilley, Dolan, and LaPlante so testified, which is competent evidence of the legitimacy of this assertion. Thus, in order to overcome defendants' summary judgment motion, Johnson must present evidence that the justification is pretextual.

Johnson argues that the defendants' justification is false because Principal Goodspeed and Superintendent McLaughlin produced positive evaluations of Johnson in the early winter and spring of 2001 and because an October 2000 evaluation the defendants rely upon was performed shortly after Johnson had returned from maternity leave from the 2000 birth. Johnson offers that her students GATES scores improved over her three years as the third-grade teacher. Johnson also criticizes the vague references board members Cilley and LaPlante make to complaints they received about Johnson because defendants offer no corroborating evidence from individuals who may have voiced those complaints. In fact, one of the alleged complainants signed the petition asking the board to reconsider Johnson's contract. Johnson next challenges the defendants' contention that board members Cilley and LaPlante were unaware of the second pregnancy. According to Johnson, it is "inconceivable that ... LaPlante could see [Johnson] approximately every two weeks for about three months and not notice the unmistakable signs of advancing pregnancy." (Pl.'s Mem. Opp'n at 10.) As for Cilley, Johnson argues that she likely did know because she worked with MacArthur, who knew, and the fact of Johnson's pregnancy "may have come up in conversation somewhere along the way." In addition to her efforts to show "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the defendants' stated justification, *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 56 (1st Cir.2000), Johnson also points to LaPlante's statement that she voted against giving Johnson a continuing contract, in part, because Princeton is a "poor school." Finally, Johnson attempts to show that the defendants' reasons for denying the continuing contract were nothing more than after-the-fact justifications, *i.e.*, framed after Johnson had commenced adversarial proceedings. *See id.* at 55–56 (addressing different ways in which pretext can be shown).

"[E]vidence constituting a prima facie case along with evidence of pretext can defeat summary judgment 'provided that the evidence is adequate to enable a rational factfinder reasonably to infer that unlawful discrimination was a determinative factor in the adverse employment action.'" *Estades–Negroni v. Assocs. Corp. N. Am.*, 345 F.3d 25, 32 (1st Cir.2003) (quoting *Rodriguez–Cuervos v. Wal–Mart Stores, Inc.*, 181 F.3d 15, 22 n. 5 (1st

Cir.1999)). In the context of a tenure denial case, where the employer bases it justification for denying tenure on a failure of the plaintiff to meet standards, pretext is shown only with "evidence ... of such strength and quality as to permit a reasonable finding that the denial of [the continuing contract] was 'obviously' or 'manifestly' unsupported." *Brown v. Trustees Boston Univ.*, 891 F.2d 337, 346 (1st Cir.1989).[6] In the present case Johnson without question establishes her prima facie case. Likewise the defendant has clearly articulated a legitimate nondiscriminatory reason for the decision not to offer a continuing contract: the plaintiff was not a good enough teacher to deserve "lifetime tenure" at their school. The school committee, under Maine law, has "unfettered discretion" to make such a decision. *Marxsen v. M.S.A.D. No. 5*, 591 A.2d 867, 869 (Me.1991), *overruled on other grounds by Underwood v. Presque Isle*, 1998 ME 166, ¶ 22, 715 A.2d 148, 155.

■ However, just because the Board's discretion must be "unfettered," it does not follow that its discretion is without limits. *Mobijohn v. Ellenville Cent. Sch. Dist.*, 1995 WL 574461, *11, n. 25 (N.D.N.Y. Sep. 28, 1995). For example, in *Merhige v. Copiague School District* the court, discussing New York law similar to Maine's, stated that a school board's discretion is "unfettered unless the teacher establishes that the board acted for a constitutionally impermissible reason or in violation of a statutory proscription." 76

A.D.2d 926, 429 N.Y.S.2d 456, 458 (1980). In this particular case, which turns virtually entirely on the credibility of the four school board members, the plaintiff has generated evidence from which it would be possible for a factfinder to infer that the school board members' stated justifications were not true. First, she has presented evidence that creates a factual dispute about whether all four members knew of her pregnancy. She has also pointed to inconsistencies and weaknesses in the purported justification and a real financial motive for basing her termination upon the fact that she was pregnant. Furthermore, the record might support the finding that the justifications were *post hoc*, provided in anticipation of litigation. The facts present a classic case under the *Santiago–Ramos* formulation wherein it would be possible for a factfinder to infer that the defendants did not act for the asserted non-discriminatory reasons, but rather acted out of discriminatory animus. That determination can only be made in the context of a trial on the merits.

### 2. The Claim Against School Union # 107

■ Defendant School Union # 107 has separately moved for summary judgment on the basis that it was not Johnson's employer. School unions [7] are creatures of Maine's statutory scheme and are difficult entities to place into the context of traditional Title VII litigation that commonly addresses issues of parent-subsidiary liability under theories such as the integrat-

---

6. In *Brown*, the First Circuit Court of Appeals indicated that, in order to succeed, the professor plaintiff therein was required "to show that the University *manifestly* applied an unequal standard to her tenure application." 891 F.2d at 346. However, this does not appear to be the only way a plaintiff can prove discriminatory denial of tenure. There is no indication in *Brown* that the other methods of showing pretext, *see Santiago–Ramos*,

217 F.3d at 55–57, do not apply in this context.

7. A school union is not the same thing as an union school under 20–A M.R.S.A. § 2101. *See Pickering v. Town of Sedgwick*, 628 A.2d 149 (1993). The case law strengthens the notion that a school union is a separate and distinct legal entity.

ed-enterprise test or common-law agency principles. *See, e.g., Romano v. U–Haul Int'l,* 233 F.3d 655, 662 (1st Cir.2000). In this case it is undisputed that Johnson was employed by the second named defendant, the Princeton School Department. However, Johnson claims that School Union # 107 is a proper defendant because the two probationary contracts previously awarded to the plaintiff had been signed by the School Union's superintendent.

School Union # 107 has four employees, the superintendent and three secretaries. The functions of a school union are performed by the union committee which consists of the school boards of the various school administrative units that form the union. 20–A M.R.S.A. § 1902. Those union functions are limited to the following: employing a superintendent, fixing his or her salary, providing the superintendent with an office, supplies, and assistants; determining the "relative amount of service to be performed by the superintendent in each unit," and apportioning costs for such employment among the members of the union. 20–A M.R.S.A. §§ 1051, 1053, 1054, 1902. Additionally a school union may authorize a school administrative unit within the school union to serve as a contractual employer of teachers who provide services to more than one unit in the union and a school union may assume additional responsibilities if the school boards of the school administrative units making up the union delegate those responsibilities by majority vote of each school board. 20–A M.R.S.A. § 1902 (E. & F.). There is nothing in the summary judgment record to suggest that either of those two provisions were invoked in this case.

A school administrative unit, on the other hand, is responsible for "operating [ ] public schools." *See* 20–A M.R.S.A. § 1(26). The authority to dismiss Johnson was vested in the Princeton School De-partment, the operative school administrative unit, and it is the proper defendant in this action. The only apparent reason for naming School Union # 107 is that when the twenty-five Princeton School Department employees are aggregated with the four School Union # 107 employees and the over seventy-five Baileyville School District employees, the total number of employees exceeds one-hundred individuals. That fact alone does not make School Union # 107 Johnson's employer under either Title VII or the Maine Human Rights Act. In his dealings with Johnson, Superintendent McLaughlin was at all times acting on behalf of the Princeton School Department as authorized by statute and not on behalf of his own employer, the school union. Johnson had no employment relationship with School Union # 107.

### Conclusion

Based upon the foregoing, School Union # 107's motion for summary judgment is **GRANTED.** The Princeton School Department's motion is **DENIED.**

*So Ordered.*