Janet ALLEN, Administrator of the Estate of Kathy Annette Allen, Deceased; and Donald Allen and Janet Allen, As Parents of Kathy Annette Allen, Deceased, Appellants,

v.

Jack ANDERSON, Dennis Massey, and Art R. LeTourneau, Individually and As Employees of the City of Ottumwa, Iowa; and the City of Ottumwa, Iowa, A Municipality, Appellees.

No. 91–1514.

Court of Appeals of Iowa.

June 25, 1992.

Joni L. Keith and Lloyd E. Keith of Keith, Orsborn, Bauerle, Milani & Neary, Ottumwa, and Vern M. Ball, Bloomfield, for appellants.

David Hester and Thomas M. Walter of Johnson, Hester & Walter, Ottumwa, for appellee Anderson.

Thomas F. Kintigh of Griffin, Dew & Kintigh, Ottumwa, for remaining appellees.

Heard by DONIELSON, P.J., and SACKETT and HABHAB, JJ.

DONIELSON, Presiding Judge.

In the early morning hours of April 11, 1987, Donald Gene Petary and Andrew Six drove to the home of Donald and Janet Allen at Hidden Valley Trailer Park located on Highway 34, west of Ottumwa, Iowa. When Petary and Six arrived, Donald and Janet Allen were asleep in their mobile home with their two daughters, Christine, age sixteen, and Kathy, age twelve. Petary and Six awoke the Allens and asked about an older model pickup truck the Allens had advertised for sale. Janet Allen agreed to take Petary and Six for a test drive.

During the test drive, Petary and Six threatened Janet with a knife and bound her with duct tape. When they returned to

the Allen home, Petary and Six also bound Donald Allen with duct tape, and they raped Christine Allen. Kathy Allen awoke as Six attempted to place duct tape over her mouth. Janet heard Kathy crying, and Six told Janet to "tell her to shut up or I'll kill every one of you right now." Janet tried to calm Kathy telling her "You don't want to die and you don't want us to die, do you, Kathy?" Kathy replied, "No mommy, but I'm scared." Kathy then remained silent.

Petary placed Kathy and Christine in the station wagon that Petary and Six had driven to the Allen residence. Six followed, attempting to force Donald and Janet into the station wagon as well. As Six held Janet with a knife to her throat, Donald broke away and ran to the home of a neighbor, Gladys Bishop. As Janet struggled with Six, Christine attempted to pull Kathy from the station wagon, but she was unable to free her. Christine then ran to the home of another neighbor, Ruth Cubbage. Janet's struggle with Six ended when he cut her throat with the knife, and Janet fell to the ground.

Gladys Bishop immediately called 911. The call came in at 12:44 a.m. according to ambulance records from the Ottumwa Regional Health Center. Gladys Bishop informed Ottumwa Police Dispatcher Diane Franklin of the incident and requested an ambulance be sent. Franklin dispatched the Wapello County Sheriff to the Allen residence.

As Gladys Bishop made her phone call, Donald and neighbor Tony Steele saw Petary and Six leave with Kathy in the station wagon, and at 12:44 the dispatcher put out a bulletin using a description of the station wagon.

Upon hearing the dispatch, Ottumwa Police Department Officer Mark Hall immediately drove to the intersection of Highway 63 and West Fourth to watch for the described vehicle. He arrived at the intersection within one minute of the dispatch. Highway 63 was the only direct route to the destination of Petary and Six, the Betty Six residence at 307 North Clay in Ottumwa. Officer Hall testified he remained at

that spot until a few minutes after 1:00 a.m. when he saw a car he thought was the suspect vehicle. After following the car for approximately one minute, he determined it was not the Petary and Six station wagon, and he returned to the intersection. He then stayed at the intersection for at least twenty minutes until he was summoned to the Wapello County Courthouse parking lot.

Sheriff's Chief Deputy Don Kirkendall arrived at the Allen residence at 12:56 a.m. After speaking briefly with Donald Allen, Deputy Kirkendall called the Ottumwa Police Department to report the kidnapping, report the destination of Petary and Six, and request a second ambulance for Christine. The call was made before 1:04 a.m., and the Ottumwa Regional Health Center's records show the second ambulance was dispatched at 1:04 a.m. Deputy Kirkendall was placed on hold by the dispatcher three times during the conversation; once to dispatch the ambulance, twice to dispatch officers to an illegally-parked car on Elm Street in Ottumwa.

Finally, Deputy Kirkendall was able to specifically request that officers of the Ottumwa Police Department respond to the Betty Six residence at 307 North Clay which was the destination of Petary and Six with the kidnapped Kathy. The dispatcher agreed to dispatch vehicles to investigate that residence, and Deputy Kirkendall advised Donald Allen that officers from the Ottumwa Police Department would be sent to the address. Relying upon the Ottumwa Police Department, Deputy Kirkendall and Donald Allen refrained from immediately going on their own to the Betty Six residence.

The station is approximately three minutes from the Betty Six residence. At least two officers were within one minute of the Betty Six residence.

However, instead of putting out an all-points bulletin for Petary and Six, the dispatcher took a call regarding nuisance telephone calls. Finally, she wrote a note to Ottumwa Police Officer Jack Anderson, the 11:00 a.m. to 7:00 a.m. shift supervisor, who was in the police station working on a

computer. In response to the dispatcher's note, Officer Anderson simply advised the dispatcher to have Officer Chiles come to the station. The dispatcher called Officer Chiles, who was investigating an illegally-parked car, to request he come to the station. However, the dispatcher failed to use the emergency code or to otherwise inform Officer Chiles the situation was an emergency. After waiting at least fifteen minutes at the station for Officer Chiles to arrive, Officer Anderson asked the dispatcher where Officer Chiles was located. Officer Anderson then left the station and drove to find Officer Chiles. He found Officer Chiles still investigating an illegally-parked car.

Officer Anderson then instructed all but one of the officers on his shift to report to the parking lot of the Wapello County Courthouse. When they were all assembled, the officers were given some information about the situation, but they were not informed Kathy had been kidnapped. All then proceeded to the Betty Six residence.

Deputy Kirkendall met the Ottumwa Police Officers when they arrived at 1:37 a.m., thirty-three minutes after Deputy Kirkendall had requested their assistance. After having completed some further investigation at the Allen residence, Deputy Kirkendall had gone to the Betty Six residence, arriving at 1:32 a.m. It had taken him between seven and ten minutes to make the drive. After several minutes of discussion, Deputy Kirkendall, Officer Anderson, and several other officers knocked on Betty Six's door. A few minutes later, Betty Six answered the door and told the officers Petary and Six had left between ten and twenty minutes ago. She said the two had talked with her and switched vehicles before leaving. Betty Six had seen an unidentified female in the car. Betty Six stated that as Petary and Six drove away in a Mercury Lynx, she had looked out the window and observed Deputy Kirkendall's car pull into view.

Kathy Allen was killed by Petary and Six later that morning after they attempted to rape her.

Officer Anderson had been hired by the Ottumwa Police Department on June 1, 1974. He completed his 240–hour basic recruit class at Indian Hills Community College on June 28, 1974. He resigned on November 4, 1977, to work for the Ottumwa Postal Service. With no additional training, he was again hired by the Ottumwa Police Department on July 7, 1979.

Officer Anderson received no in-service training until May 21, 1980, when he was certified in the use of the intoxilyzer. On June 1, 1982, he received training in the use of the baton, other striking instruments, and in precision driving. On July 2, 1986, he attended a one-hour course on the 1986 revisions to the Iowa Code. On November 20, 1986, he attended a one-hour course on the use of chemical agents.

On August 30, 1985, Anderson received a serious head injury in a hot pursuit motor vehicle accident. He filed a lawsuit against the other driver alleging in his petition that he suffered permanent personal injuries including the inability "to perform all the normal tasks and duties required him in his work; he will in the future be unable to perform all the normal tasks and duties required of him in his work; he has since said collision been disabled; he will in the future be disabled." Since August 1985 Anderson has received medical treatment and prescription medication for his condition.

Later in 1985 Anderson took a leave of absence from his position with the Ottumwa Police Department to campaign for a seat on the Ottumwa City Council. After being elected, he took a one-year leave of absence from January 1, 1986, to January 24, 1987. During Anderson's term as a city councilman, Police Chief LeTourneau approached him about returning to law enforcement and offered him a position as a supervisor responsible for administration and budgeting. Without properly qualifying through the civil service, Anderson was rehired and promoted to the position of supervisor of the 11:00 p.m. to 7:00 a.m. shift. The duties of the position were not administration and budgeting. Anderson had no supervisor training and had no

training in hostage or kidnapping situations. Anderson had not advised his superiors of his continuing physical and psychological problems resulting from the motor vehicle accident.

On April 1, 1987, ten days before Kathy Allen was kidnapped, Officer Anderson was accused of sleeping on the job. He denied the accusation and attributed his behavior to his continuing permanent injuries. On the night before and the night of the kidnapping, Officer Anderson, claiming to be overly tired, attempted to take the night off but was reprimanded for doing so. Two weeks after the incident, Anderson's medical and psychological problems caused him to take sick leave. His sick leave lasted from April 27, 1987, to September 11, 1987, when he was finally terminated from his employment with the Ottumwa Police Department. In June of 1987, Anderson had been given an MMPI psychological test which indicated he was not fit to serve as a police officer. A test given in September of 1987 rendered the same result.

The Allens instituted these proceedings against the City of Ottumwa and members of its police department, including Officer Jack Anderson, Chief Art R. LeTourneau, and Dennis Massey. The Allens based their claims on 42 U.S.C. section 1983 as well as on negligence theories. The Allens' drafted petition was cast in four separate counts. The first two counts are based on 42 U.S.C. section 1983. The plaintiffs allege the City of Ottumwa and its employees, Jack Anderson, Dennis Massey and Art R. LeTourneau deprived Kathy of her fourteenth amendment substantive due process rights by failing to properly train their employees and in failing to respond to Deputy Kirkendall's request for assistance. In the third and fourth counts, the plaintiffs allege the City of Ottumwa, Jack Anderson, Dennis Massey, and Art R. LeTourneau acted negligently in several respects.

The district court granted the defendants' motion for summary judgment on all claims, and the Allens have appealed. "Our task on appeal is to determine wheth-er a genuine issue of material fact exists and whether the law was correctly applied." *City of McGregor v. Janett,* 480 N.W.2d 576, 578 (Iowa App.1991) (quoting *Adam v. Mount Pleasant Bank & Trust Co.,* 355 N.W.2d 868, 872 (Iowa 1984)).

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* (citing Iowa R.Civ.P. 237(c); *Farm Bureau Mut. Ins. Co. v. Milne,* 424 N.W.2d 422, 423 (Iowa 1988)). The moving party has the burden to show the nonexistence of a material fact, and the evidence must be viewed in the light most favorable to the resisting party, *Id.* The procedure is functionally akin to a directed verdict, and every legitimate inference that reasonably can be deduced from the evidence should be afforded the resisting party. *Id.* A fact issue is generated if reasonable minds can differ on how the issue should be resolved, but if the conflict in the record consists only of the legal consequences flowing from undisputed facts, entry of summary judgment is proper. *Id.* If the motion is properly supported, the resisting party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* (quoting Iowa R.Civ.P. 237(e)).

We find no genuine issues of material fact exist on the Allens' claims and, therefore, affirm the grant of summary judgment on all claims.

I. *Claims Based on 42 U.S.C. section 1983.* We first address the plaintiffs' challenge to the trial court's dismissal of their 42 U.S.C. section 1983 claims. Section 1983 imposes liability on "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage ... subjects, or causes to be subjected, any citizen of the United States or other person ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws...." 42 U.S.C. § 1983 (1988). Our first inquiry is, therefore, whether the plaintiff has been deprived of a right se-

cured by the Constitution and laws. *Baker v. McCollan,* 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433, 439 (1979).

■ The Allens contend their daughter Kathy was deprived of her substantive due process right to life, guaranteed by the due process clause of the fourteenth amendment. The fourteenth amendment provides no state shall "deprive any person of life ... without due process of law." U.S. Const. amend. XIV, § 1. As such, section 1983 does not create new rights; but rather, the statute merely provides a means for redress if an existing federal right has been infringed. *Baker v. McCollan,* 443 U.S. at 140, 144 n. 3, 99 S.Ct. at 2692, 2694 n. 3, 61 L.Ed.2d at 439, 442 n. 3; *Watson v. City of Kansas City,* 857 F.2d 690, 694 (10th Cir.1988).

■ A. Special Relationship. In essence, the plaintiffs' first theory asserts the fourteenth amendment due process clause guarantees a citizen the right to be free from erroneous statements by a police dispatcher indicating the police will respond to requests for assistance made by another peace officer, thereby creating a situation which places the citizen's life in jeopardy by lulling other potential rescuers into a false belief that their assistance would simply be redundant.

We do not believe the due process clause can be so interpreted. Were we to give the fourteenth amendment such an interpretation, we would stretch its meaning beyond the logical breaking point. In *Bowers v. Devito,* the Seventh Circuit Court of Appeals stated "[T]here is no constitutional right to be protected by the state against being murdered by criminals or madmen. It is monstrous if the state fails to protect its residents against such predators but it does not violate the due process clause of the Fourteenth Amendment or, we suppose, any other provision of the Constitution." 686 F.2d 616, 618 (7th Cir.1982). The Seventh Circuit in *Bowers* reasoned "The Constitution is a charter of negative liberties; it tells the state to let people alone; it does not require the federal government or the state to provide services, even so elementary a service as maintain-

ing law and order." *Id.* Most recently, in *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 195, 109 S.Ct. 998, 1004, 103 L.Ed.2d 249, 258 (1989), the Supreme Court solidified the principle that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *See generally* Marne E. Brom, Case Note, 39 Drake L.Rev. 911 (1990).

We recognize that exceptions to this general rule do exist. "[I]n certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." *DeShaney,* 489 U.S. at 198, 109 S.Ct. at 1004–1005, 103 L.Ed.2d at 260. "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Id.* at 199–200, 109 S.Ct. at 1005, 103 L.Ed.2d at 261. *See Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982); *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

The Supreme Court has articulated the rationale underlying this principle: "[W]hen the State by the affirmative exercise of power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." *DeShaney,* 489 U.S. at 200, 109 S.Ct. at 1005–1006, 103 L.Ed.2d at 261–62. Importantly, however, the Court has stated "[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *Id.* at 200, 109 S.Ct. at 1006, 103 L.Ed.2d at 262. "In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—

through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, *not its failure to act to protect his liberty interests against harms inflicted by other means." Id.* (Emphasis added.).

Crucial to the holding of the *DeShaney* case was the factual finding that "[w]hile the State may have been aware of the dangers that [the victim] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *Id.* at 201, 109 S.Ct. at 1006, 103 L.Ed.2d at 262.

The plaintiffs attempt to distinguish *DeShaney* in this respect, asserting that in the instant case the police dispatcher working for the Ottumwa Police Department told Deputy Kirkendall she would dispatch Ottumwa police officers to go to the Betty Six residence. This, the plaintiffs claim, helped create, or at least rendered Kathy more vulnerable to, the life-threatening situation in which she found herself. There is no claim in this case that Kathy Allen was ever in the custody of the State. The plaintiffs contend the dispatcher's statement to Deputy Kirkendall had the effect of limiting Kathy's alternative sources of aid because it caused the deputy as well as Donald Allen to be lulled into inaction in reliance upon the response of the Ottumwa Police who were closer to the address. As such, Deputy Kirkendall and Donald Allen were effectively restrained from rendering aid to Kathy.

This restraint of Deputy Kirkendall and Donald Allen's efforts to aid Kathy constituted a deprivation of Kathy's constitutionally-secured right to life, according to the plaintiffs. Therefore, the Allens assert, an affirmative duty was placed upon the state actors to provide for Kathy's safety. The plaintiffs contend that, had they not relied on the police dispatcher's representations officers would be sent to the Betty Six residence to intercept Kathy's kidnappers, Deputy Kirkendall and Donald Allen would have gone and been able to protect Kathy on their own.

Nevertheless, we do not believe the dispatcher's statements in this case constitute the type of affirmative restraint of a person's liberty sufficient to implicate the due process clause. In any event, we do not believe the actions of the police, the dispatcher, or the city can be said to have constituted a deprivation of Kathy's right to life.

Clearly, it was the actions of Petary and Six which took Kathy's life. No matter how much emphasis is placed upon the dispatcher's incorrect representations to Deputy Kirkendall, the fact remains it was Petary and Six who kidnapped and murdered Kathy, and the defendants in this action took no affirmative action which helped create the dangerous situation or made Kathy more vulnerable to it. Accordingly, we find the plaintiffs failed to make the threshold showing that Kathy was deprived of a constitutional right.

B. Alternative Theories. The plaintiffs also assert two alternative theories which they claim subject the defendants in this action to liability under section 1983.

First, the plaintiffs attempt to base their section 1983 claim on allegations the City of Ottumwa and Dennis Massey, the training officer, and Art R. LeTourneau, the police chief, provided inadequate training and supervision to Diane Franklin, the police dispatcher, and to Officer Jack Anderson. The plaintiffs contend the defendants' failure to properly train and supervise the dispatcher and officer amounts to deliberate indifference to Kathy's rights and thereby subjects the department to section 1983 liability.

■ We are not persuaded by this argument. Section 1983 does not contemplate supervisory strict liability through the doctrine of *respondent superior. City of Oklahoma City v. Tuttle,* 471 U.S. 808, 818, 105 S.Ct. 2427, 2433, 85 L.Ed.2d 791, 801 (1985). Only under certain circumstances will an allegation that a supervisory employee or a municipality has failed to adequately train or supervise subordinate employees serve as the basis for section 1983 liability. *See City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 1204,

103 L.Ed.2d 412, 426 (1989); *Hahn v. McLey,* 737 F.2d 771, 773 (8th Cir.1984).

■ A municipality may only be held liable for the actions of its agents or employees if a deprivation of constitutional rights occurs as a result of a municipal custom or policy. *Tuttle,* 471 U.S. at 818, 105 S.Ct. at 2433, 85 L.Ed.2d at 801; *Polk County v. Dodson,* 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509, 521 (1981); *Monell v. New York City Department of Social Services,* 436 U.S. 658, 689–90, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611, 634–35 (1978). The municipality may only be held liable under section 1983 for its own acts of policymaking. "[A] governmental entity is liable under [section] 1983 only when the entity itself is a 'moving force' behind the violation. That is the entity's official 'policy or custom' must have 'caused' the constitutional violation; there must be an 'affirmative link' or a 'causal connection' between the policy and the particular constitutional violation alleged." *Clay v. Conlee,* 815 F.2d 1164, 1170 (8th Cir.1987) (citing *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791, 803–04 (1985); *Pembauer v. City of Cincinatti,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)).

To hold a municipality liable under section 1983, one cannot merely allege "the existing training program for a class of employees, such as police officers, represents a policy for which the city is responsible." *City of Canton,* 489 U.S. at 389, 109 S.Ct. at 1205, 103 L.Ed.2d at 427. Rather, the question must be whether the inadequacy of the training "can justifiably be said to represent 'city policy.'" *Id.* "[T]he inadequacy of police training may serve as the basis for [section] 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388, 109 S.Ct. at 1204, 103 L.Ed.2d at 426.

■ The municipal liability analysis is also applicable in determining whether supervisors or "quasi-policymakers" have been deliberately indifferent in supervising or training their employees. *Greason v. Kemp,* 891 F.2d 829, 836–37 (11th Cir.1990) (borrowing the *City of Canton* Court's analysis). To determine a supervisor's liability, the court must decide, among other issues, whether the supervisor's conduct was causally related to the constitutional infringement by his or her subordinate. *Greason,* 891 F.2d at 836–37 (citing *Estelle,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251).

■ Because we find the plaintiffs failed to make the threshold showing that Kathy was deprived of a federally protected right, we cannot determine whether Massey or LeTourneau's conduct was causally related to a deprivation of rights. Therefore, we must find the Allens have not generated a genuine issue of material fact concerning whether Dennis Massey or Art R. LeTourneau provided inadequate training or supervision to the dispatcher and officer such that Massey or LeTourneau's actions can be said to have constituted deliberate indifference to the rights of the citizens with whom the dispatcher and officer would come into contact. For the same reason, we do not believe the Allens have generated an issue of fact concerning whether any inadequate training or supervision was the result of an Ottumwa city policy or custom.

■ Second, the Allens assert Iowa Code section 719.2 imposed a special duty on the police to respond to Deputy Kirkendall's requests for assistance. The failure to respond, claim the Allens, subjects the police to section 1983 liability. Section 719.2 provides:

> Any person who is requested or ordered by any magistrate or peace officer to render the magistrate or peace officer assistance in making or attempting to make an arrest, or to prevent the commission of any criminal act, shall render assistance as required. A person who, unreasonably and without lawful cause, refuses or neglects to render assistance when so requested commits a simple misdemeanor.

The plaintiffs assert the Ottumwa Police Department was negligent by failing to exercise its duty as contemplated by the statute.

We reject this theory as well. Iowa Code section 719.2 does not contravene the public duty doctrine by creating a private duty between police officers and citizens under which the officers owe the citizens a duty to respond. Even assuming section 719.2 did create such a duty and the statute was intended to protect a class of citizens to which Kathy Allen belonged against the particular harm which she suffered, section 1983 does not impose liability for violations of duties arising out of tort law. *See Baker v. McCollan,* 443 U.S. at 146, 99 S.Ct. at 2695, 61 L.Ed.2d at 443. Section 1983 imposes liability for deprivations of federal rights. *Watson,* 857 F.2d at 694.

II. *State Tort Claim.* Next the plaintiffs assert the trial court erred in dismissing their negligence claim. The plaintiffs contend the defendants breached a duty they owed to Kathy to respond and protect her. The breach of this duty, argue the plaintiffs, was a proximate cause of Kathy's death. We affirm the trial court's grant of the defendants' motion for summary judgment on this claim as well.

 The Iowa courts recognize the public duty doctrine which establishes that the duty of the police to protect the citizenry is owed to the public and not to individuals. *See Hildenbrand v. Cox,* 369 N.W.2d 411, 415 (Iowa 1985). The public duty doctrine is said to promote vigorous police work. *See Smith v. State,* 324 N.W.2d 299, 301 (Iowa 1982).

An exception to this general rule barring recovery does exist when the citizen can show he or she had a special relationship with the police officer. *Hildenbrand,* 369 N.W.2d at 415. To establish the existence of such a special relationship, the citizen must show (1) the police created the situation which placed the citizen's life in jeopardy, or (2) the police took the citizen into their custody or control. *Hawkeye Bank & Trust Co. v. Spencer,* 487 N.W.2d 94, 97 (Iowa App.1992) (application for further review pending).

 The plaintiffs contend Iowa Code section 719.2 created a duty on the part of the police department to respond to Deputy Kirkendall's requests for assistance. According to the plaintiffs, the officers' failure to respond constituted a negligent breach of that duty.

We disagree. Iowa Code section 719.2 does not contravene the public duty doctrine. The statute was clearly not intended to create a private right of action in individual citizens to sue police officers for negligence. *See, e.g., Sankey v. Richenberger,* 456 N.W.2d 206 (Iowa 1990).

 We also reject the plaintiffs' claim that their reliance upon the police dispatcher's representations gave rise to a special relationship. In *Spencer,* we rejected the justifiable reliance theory of recovery, again on policy grounds. 487 N.W.2d 97.

III. *Conclusion.* We do not believe the plaintiffs have engendered a genuine issue of material fact on any of their claims. We find the plaintiffs cannot show Kathy was deprived of a federal right. We also find the recovery under the plaintiffs' negligence claims is barred by the public duty doctrine. In accordance with these findings, we affirm the trial court's grant of the defendants' motion for summary judgment on all of the plaintiffs' claims.

The costs of this appeal are taxed to the appellants.

For all the reasons stated, the judgment of the district court is affirmed.

AFFIRMED.