**Alvin DUFFEY, Plaintiff,**

v.

**Charlie BRYANT, et al., Defendants.**

**No. 7:95–cv–87 (WDO).**

United States District Court,
M.D. Georgia,
Valdosta Division.

Jan. 6, 1997.

---

James C. West, III, Decatur, GA, for Alvin Duffey.

William C. Sanders, Thomasville, GA, for Roy C. Sumner, Cook County Board of Commissioners, Cook County Sheriff's Department, Charlie Bryant, Melissa Duke, Roy Wheeler, Paul Hopson, Willie Bachelor.

Randall S. Acree, Adel, GA, for Memorial Hospital of Adel, Inc.

### ORDER

OWENS, District Judge.

On July 14, 1993, Rudolph Duffey died naked in a cell in Cook County Jail of chronic malnutrition and dehydration (Answer, ¶ 17). His brother Alvin, acting as administrator of his estate and as representative for his two children, filed this § 1983 action against the county and police officers involved in the arrest and detention. On cross motions for summary judgment, the foremost issue for the court is whether the doctrine of qualified immunity will shield the police officers from liability. Because federal case law in existence at the time compelled the conclusion that their actions constituted deliberate indifference to Rudolph Duffey's psychological and medical needs, the court finds that the police officers who were responsible for watching over and caring for the jail's inmates during his detention are not entitled to qualified immunity.

### FACTS [1]

#### I. Background and Arrest

Rudolph Duffey, a restaurant manager in his early thirties, was diagnosed with manic depression in August 1992 and was prescribed medication to treat the disorder. Duffey behaved normally as long as he was taking his medicine, but would begin to show symptoms of his manic depression when he stopped taking it.

Around July 4, 1993, Duffey began to show signs of not having taken his medicine. His brother, Alvin Duffey, tried to get him to take the medicine, but Duffey refused. Later that night or early the next morning, Duffey left his father's house in McDonough, Georgia, in his car. On July 7, 1993, at around 8:30 a.m., Alvin Duffey filed a missing persons report with the Henry County Police Department in which he explained that his brother was a manic depressive in need of his medication.[2]

On the evening of July 6, Officer Roy Wheeler of the Cook County Sheriff's Department was patrolling Interstate 75 south of Adel, Georgia, when he pulled Duffey over for driving approximately 50 miles per hour in the southbound emergency lane.[3] Wheeler asked Duffey for his license, and Duffey

---

1. The defendants have filed a number of affidavits that conflict in some places with the deposition testimony and other evidence on file with the court. In determining the facts cited herein, the court has relied almost exclusively on depositions, the transcript of the coroner's inquest, and exhibits.

2. The times and dates of the events that occurred before Duffey's arrest are unclear, as the dates provided in Alvin Duffey's deposition conflict in a number of places with the police report. In his deposition, Alvin Duffey claims his brother left at approximately 11:00 p.m. on the night of July 4, and that he filed the missing persons report on July 5 (Alvin Duffey, at 27–29). On the other hand, the police report states that Alvin Duffey filed the missing persons report on July 7 at 8:30 a.m., and also states that Alvin Duffey told the police that his brother had left on July 6 at 6:30 a.m. (Exh. 23 to Pl. Motion for Summary Judgment). As these discrepancies are not relevant for purposes of this opinion, for consistency's sake the court uses the times provided by the police report.

3. The arrest report states that Duffey was arrested at 10:48 p.m. on the evening of July 6, 1993. Although the Cook County Jail Radio Operators Reports for July 6 through July 14 are on file with the court, the logs in the court's possession do not contain entries for the hours after 5:35 p.m. on July 6 (Exh. 3 to Pl. Motion for Summary Judgment). The logs for the other days cover the evening hours. At this time, the court notes this only to point out that the logs detailing the time of Duffey's arrest and processing are not available to the court.

The court also notes that an entry on July 6 at 14:28, or 2:28 p.m., states "Advised bad weather coming in from west; need to power down on computer" (Exh. 3 to Pl. Motion for Summary Judgment). A computer shutdown offers a likely explanation for the lack of entries for the evening hours of July 6. It also indicates that if, as Alvin Duffey claims, a missing persons report had been filed prior to Duffey's arrest, the Cook County Police may not have been able to find out about it when they arrested him.

told him that his license had been suspended. Wheeler then called in Duffey's name and birthdate to Paul Hopson, the Cook County dispatcher, and asked that the information be processed on GCIC, the statewide network of criminal information.

Hopson reported back that Duffey's license was indeed suspended. Duffey told Wheeler that the car was his brother's and that he had borrowed it to get something to eat in McDonough (well over one hundred miles away), causing Wheeler to conclude that Duffey was lost. At that time, Wheeler also noticed that Duffey's pants were on inside out and wet across the front (Wheeler, at 7–9).

Officer Wheeler placed Duffey in the back of the patrol car and took him to the Cook County Jail. In the car, Wheeler spoke with Duffey and says that Duffey acted and responded to questions rationally (Wheeler, at 13). Once they arrived at the jail, Hopson and Wheeler tried to contact Duffey's family. Although the number and exact outcome of calls made is in dispute,[4] it is clear that the police were not able to reach Duffey's family that night or at any time during his incarceration. When they asked him if he had ever been hospitalized in the past three years, Duffey told the officers that he had been treated for a salt deficiency a few months earlier but did not mention his prior psychiatric history (Hopson, at 35).

At some point, Wheeler and Hopson had a discussion wherein they concluded that, judging from the fact that he was lost and his pants were inside out and wet, Duffey was probably suffering from a mental disorder of some kind (Coroner's Inquest, at 45; Wheeler, at 21). Hopson reported their observations about Duffey to their supervisor, Melissa Duke, who said that she would "check on

it" the next day (Hopson, at 35). Officer Wheeler left before Duffey was processed into the jail, and had no further contact with Duffey (Wheeler, at 20).

Hopson testified that while Wheeler was processing Duffey, Magistrate Judge Ronnie Fender happened by the jail to attend to an unrelated matter. Once the officers determined that Duffey's license had been suspended several times, they requested that a warrant be issued charging him with being a habitual violator. Hopson says that Judge Fender talked with Duffey in another room, and then wrote out the warrant (Hopson, at 66–71). This was the only time Duffey was brought before a judicial officer during the eight days of his incarceration.

## II. Supervision of Jail and Aberrant Behavior

Primary responsibility for overseeing the jail rested with Chief Jailer Melissa Duke and with the dispatcher on duty at the time. However, much of the evidence strongly suggests that the daily operations of the jail were performed in large part by its prisoner trusties. For instance, it was the trusties who gave the inmates their two meals a day and who regularly reported any problems or changes that might need attention to the officers on duty (Hopson, at 37–40, 59). Although both Chief Jailer Duke and Dispatcher Hopson testified that their duties included regular walk-throughs of the jail, neither officer remembers seeing any signs that Duffey's health was deteriorating. Both officers also testified that Sheriff Bryant had in place a policy that inmates were given medical and/or psychiatric care only upon his approval (Duke, at 22, 26–27; Hopson, at 29). The record contains no evidence indicating that Sheriff Bryant entered the jail at all during

---

4. According to the jail's telephone log, two collect calls were placed to numbers provided by Duffey. The first call, to a number Duffey said belonged to his father, apparently was not accepted. The second call, to a number Duffey said belonged to his brother, received no answer (Exh. 2 to Pl. Motion for Summary Judgment).

Officer Wheeler alleges that the dispatcher, Hopson, attempted to place a collect call to Duffey's father before he and Duffey arrived at the jail, and the person who answered did not accept the charges. Once at the jail, Wheeler states that

he too was unsuccessful when he tried to place a collect call to Duffey's father (Wheeler, 14–16). However, plaintiff's brother claims that he was at home at the time and that the entire family had been looking for Duffey and would have accepted any calls made (Alvin Duffey, at 21).

Officer Hopson says that Duffey tried again unsuccessfully to make a phone call on Wednesday, the day after he was arrested. On the following Friday, Hopson says he asked Duffey if he wanted to try to call the numbers again, but Duffey shook his head no (Hopson, at 47, 50).

the eight day period Duffey was incarcerated.

At the time of Duffey's arrest, the Cook County Jail had no air conditioning for either prisoners or employees (Hopson, at 58). Duffey was first placed in the drunk tank by himself, then in the "bullpen" with approximately eleven other prisoners. Sometime later, he was moved to his own cell after he began chasing the other prisoners around the bullpen (Coroner's Inquest, at 8–11). At some point after he was placed in this private cell, Duffey took off all his clothes and threw them, along with his bed linens, out the flap in the door of his cell and into the hall (Coroner's Inquest, at 18, 20).[5]

Duffey also began preaching loudly and barking like a dog. This barking and preaching was heard by the other prisoners and by employees in other parts of the courthouse. On more than one occasion, the courthouse employees complained about the yelling to Sheriff Charles Bryant. Bryant responded by calling the jail to find out who was yelling. Melissa Duke, the Chief Jailer, told him it was Duffey. Duke testified that she cannot recall anything being done as a result of the complaints (Duke, at 57–58).

The trusties who distributed meals to the inmates at the time, Robert Johnson and Larry Inman, told Melissa Duke or Paul Hopson on three different occasions that Duffey had refused to eat. The jail log for July 7 reports that Duffey refused his meal. The log reports that on July 9 at 6:34 a.m., "Larry Inman advised, Rudolph Duffey has not eaten since he has been here." The log again shows that Duffey refused his meal (Exhs. 4–7, Pl. Motion for Summary Judgment). The log shows no other entries concerning Duffey until he died on the 14th.[6] Robert Johnson testified at the coroner's in-

quest that Duffey ate a little while he was being held in the drunk tank, but that after he was placed in the private cell on the third floor, he would hardly eat anything (Coroner's Inquest, at 10–11).

After being informed by the trusties that Duffey was refusing to eat, Paul Hopson testified that he did not check on Duffey himself because he "couldn't leave [his] post," and "[his] duties simply wouldn't allow it" (Hopson, at 41–42).[7] He says he told his supervisor, Melissa Duke, at least once that Duffey was not eating (Hopson, at 40–41). Duke says she told Sheriff Bryant about Duffey's strange behavior more than once (Duke, at 57–58). Duke also says she informed Sheriff Bryant that Duffey was sometimes not eating, but did not recall what Sheriff Bryant's response was (Duke, at 89–90).

Sheriff Bryant does not recall ever having observed Duffey. He says he cannot recall whether he was ever told about Duffey's preaching, barking, not eating, or being naked in the cell (Bryant, at 79–82). Bryant also says that Duffey's behavior would not cause him to think Duffey had a mental disorder, because this behavior was "not unusual" in the jail and, in fact, "could be normal" (Bryant, at 82–83). Sheriff Bryant also maintains that he is satisfied with his staff's treatment of Duffey (Bryant, at 70).

Chief Jailer Duke admits that she has responsibility for prisoners' care while they are detained, and that one of her duties was to walk through the jail daily to observe the inmates and to "check on them and make sure everything is going okay in that cell" (Duke, at 85, 63–64). However, she recalls observing Duffey only two times during the entire eight days he was incarcerated (Duke,

---

5. Robert Johnson, the prisoner/trusty who found Duffey's body, testified at the coroner's inquest that Duffey was in the private cell for approximately four of the eight days he was imprisoned, and that Duffey was fully naked for at least three of those days (Coroner's Inquest, at 8, 13).

6. The log contains numerous entries about other prisoners being taken to use the phone or the showers, but there is not a single entry referencing Duffey while he was alive except for the three entries about his refusing to eat.

7. Hopson claims that he observed Duffey each time he began his shift, by checking all of the cells through the flap in the door. He claims that he saw no abnormality during any of these observations. Hopson's only communication with Duffey was when Duffey declined Hopson's invitation to attempt another phone call. Hopson testified that he never saw Duffey naked (Hopson, at 47).

at 62). The first time, Duffey was wearing pants but no shirt, was looking out the window, and did not turn around or respond to her questions. The second time she observed him he was dead (Duke, at 62). Duke says she never observed that Duffey needed care or attention (Duke, at 113).

Duffey died on July 14, having spent a total of eight days in jail. His driver's license lists his weight at 173. His weight when he died was 137. The autopsy lists his height as 72″, or 6′1″. The cause of death is listed as chronic malnutrition and dehydration (Arrest Report; Autopsy Report).[8]

One of the prisoner trusties, Robert Johnson, found Duffey's body. On the morning of July 14 when Johnson delivered Duffey's breakfast, Duffey did not respond to him. Johnson got the key, opened the door to Duffey's cell, noticed that Duffey was under his bed and that his stomach was not moving, and went and got Melissa Duke (Coroner's Inquest, at 10). Sometime later, the coroner called Alvin Duffey to inform him that his brother was dead. Only then did the Cook County Police discover that a missing persons report had been outstanding for Rudolph Duffey since at least July 7, 1993. On September 27, 1993, a coroner's inquest determined that Duffey died of natural causes.

In an amended complaint, Plaintiff Alvin Duffey sued the arresting and detaining officers, Sheriff Charles Bryant, the Cook County Board of Commissioners as a whole and its chairman, Willie Batchelor, under 42 U.S.C. §§ 1983 and 1988, and the United States Constitution. Both sides have filed motions for summary judgment.

## DISCUSSION

### I. Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be entered in favor of the movant where the entire record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

law. The court examines the substantive law involved to determine which facts are material, and all reasonable doubts regarding facts are resolved in favor of the nonmoving party. *Irby v. Bittick*, 44 F.3d 949, 953 (11th Cir. 1995).

The movant is entitled to judgment as a matter of law when the "nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Once a party has properly supported its motion for summary judgment, the burden shifts to the nonmovant to create, through significantly probative evidence, genuine issues of material fact necessitating a trial. *Id.* at 324, 106 S.Ct. at 2553.

### II. Claims Against the Board of Commissioners and Willie Batchelor

■ Plaintiff has sued the Cook County Board of Commissioners and Chairman Willie Batchelor in his official capacity under § 1983. Plaintiff has failed to adduce any evidence whatsoever other than conclusory allegations that the Board of Commissioners adopted, approved or had knowledge of any policy or practice of the Sheriff's Department. It is well-settled law in Georgia that a county and its commissioners are without authority over the sheriff or his deputies. *Board of Commissioners of Randolph County v. Wilson*, 260 Ga. 482, 396 S.E.2d 903 (1990); *Pettus v. Smith*, 174 Ga.App. 587, 330 S.E.2d 735 (1985). For these reasons, defendants are entitled to summary judgment as to all claims asserted against the Board and Willie Batchelor or any other member of the Board in his official capacity, and the Board is dismissed as a party to this action.

■ Plaintiff has also sued Willie Batchelor in his individual capacity, alleging that he failed to fulfill his duty to adequately train and/or supervise the officers involved in Duffey's incarceration. Batchelor had no inter-

---

8. Plaintiff suggests that at some point the water in Duffey's cell was shut off in order to make a minor repair and may not have been turned back on, but there is no conclusive evidence that Duf-

fey did not have access to water. Water was provided with each meal, although it is unclear whether Duffey was drinking it.

action with Duffey; thus, he cannot be held personally liable for any acts or omissions which may have caused Duffey's death. *See Brown v. Crawford,* 906 F.2d 667 (11th Cir. 1990). Moreover, as Chairman of the Board of Commissioners Batchelor had no responsibility or authority for supervising or training officers. Under these facts he cannot be held liable under § 1983 on a theory of supervisory liability. *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *Greason v. Kemp,* 891 F.2d 829, 836–37 (11th Cir.1990). Accordingly, he is entitled to summary judgment on the remaining § 1983 claim, and, because no claims remain against him, he is dismissed as a party to this action.

The only valid claim brought under § 1983 is for deliberate indifference to Duffey's medical and/or psychiatric needs. All claims brought under the First and Eighth Amendments are without merit, and defendant is entitled to summary judgment as to them.

### III. Qualified Immunity

#### A. Generally

 The defendant police officers all claim they are entitled to qualified immunity and are therefore immune from suit. "Qualified immunity protects government officials performing discretionary functions from civil trials (and the other burdens of litigation, including discovery) and from liability if their conduct violates no 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Lassiter v. Alabama A & M University,* 28 F.3d 1146, 1149 (11th Cir.1994) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). The competing

goals of the doctrine are to allow government actors to do their job without fear of a lawsuit resulting from every decision, while still permitting vindication of constitutional rights in extreme cases. *See Harlow,* 457 U.S. at 814, 102 S.Ct. at 2736 (citations omitted).

 The usual rule is that qualified immunity applies to government actors such as police officers. Only in exceptional cases, where the officer's conduct is so obviously wrong in the light of preexisting law that only a plainly incompetent officer or one who knew his actions violated the law would have done such a thing, will the officer be stripped of immunity. *Lassiter,* 28 F.3d at 1149; *Adams v. Poag,* 61 F.3d 1537, 1543 (11th Cir.1995).

 The most problematic area in qualified immunity analysis is determining whether, at the time of the conduct in question, a right was so "clearly established" that any competent official would have been aware that his conduct was in violation of the right.[9] In *Anderson v. Creighton,* the Supreme Court explained that for purposes of qualified immunity, in order for a right to be clearly established,

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (citations omitted).[10]

9. In *Lassiter,* the Eleventh Circuit pointed out that the most common error it encounters when reviewing a denial of qualified immunity is courts' allowing plaintiffs to discharge their burden by "referring to general rules and to the violation of abstract 'rights'." *Lassiter,* 28 F.3d at 1150. A recent Eleventh Circuit decision dealing with this troubled area of qualified immunity law has been vacated and scheduled for a rehearing en banc. *Jenkins by Hall v. Talladega City Bd. of Educ.,* 95 F.3d 1036 (11th Cir.1996), *vacated,* (Oct. 16, 1996). While the outcome of that rehearing may well dictate the eventual outcome of this case, the court feels that the parties to this

litigation are entitled to an opinion in the meantime.

10. An example helps. In *Anderson,* the court held that it was not enough that the right invoked—the right to be free from warrantless searches of one's home unless the searching officers have probable cause and there are exigent circumstances—was clearly established. That formulation is too abstract for purposes of qualified immunity. Rather, the district court should have considered whether it was clearly established that the specific circumstances with which the defendants in that case were confronted did not constitute probable cause and exigent cir-

For the *Anderson* court, the emphasis in qualified immunity analysis was on the "contours of the right"—that is, the boundaries of the right and whether the conduct in question was clearly violative of it—rather than on the existence of the right itself. Thus, the question is not really whether the constitutional *right* is clearly established, but whether the contours of the right are so well defined by prior case law that the specific *conduct* involved is clearly established to be a violation of the constitutional right invoked.

However, the Eleventh Circuit has repeatedly emphasized *Anderson*'s explicit holding that "the very action in question [need not have] previously been held unlawful" in order for the "clearly established" requirement to be satisfied. *McMillian v. Johnson*, 88 F.3d 1554, 1565 (11th Cir.1996) (*vacated and amended on other grounds*, 101 F.3d 1363 (11th Cir.1996)); *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir.1994). Again the requirement is that the unlawfulness of the action must have been apparent to any reasonable official in the defendant's shoes—and "reasonable" implies a modicum of competence with regard to the requirements of the law and the duties of his or her job.

Put a bit more simply to fit the present situation, the question for the court is whether it would have been apparent to a reasonable officer in each defendant's shoes that his conduct violated Duffey's constitutional rights. To answer this question, the court must not look into what each defendant actually thought or intended; the test is not a subjective one. But the court must take account of the relevant circumstances in which each defendant officer found himself—most importantly, it must focus on what each officer knew at the time. *Dolihite v. Maughon, By and Through Videon*, 74 F.3d 1027, 1041 (11th Cir.1996) (holding that " 'the relevant question on a motion for summary judgment based on a defense of qualified immunity is whether a reasonable official could have believed his or her actions were lawful in light of clearly established law and the information possessed by the official at the time the conduct occurred.' ") (quoting *Stewart v.* cumstances. *Anderson*, 483 U.S. at 639–41, 107 S.Ct. at 3038–39.

*Baldwin County Bd. of Educ.*, 908 F.2d 1499, 1503 (11th Cir.1990)). If, given what the officer knew about Duffey's condition, any reasonable officer would have known his actions violated Duffey's constitutional rights, then, and only then, the officer is not entitled to qualified immunity.

### B. The Present Case: Deliberate Indifference

Eleventh Circuit case law lays out a burden-shifting framework within which to analyze a defense based on qualified immunity. First, the defendant must show that his actions occurred within the scope of his discretionary authority. Once this has been shown, defendant's burden is satisfied. The burden then shifts to the plaintiff to show that the defendant violated clearly established constitutional law. *McCoy v. Webster*, 47 F.3d 404, 407 (11th Cir.1995) (citation omitted).

It is undisputed that all the officers' conduct occurred within the scope of their authority and pursuant to their duties as officers of the Cook County Jail. This in itself is enough to satisfy the defendants' burden. *McCoy*, 47 F.3d at 407.

The court must now consider whether the "clearly established" requirement has been satisfied—that is, whether prior case law made it apparent at the time that the defendants' conduct constituted deliberate indifference to Duffey's medical and/or psychiatric needs. Under the facts of this case, there are four defendant officers belonging to three groups distinguished by the nature of their involvement in Duffey's incarceration. Each group requires a separate analysis.

### 1. Arresting Officer Roy Wheeler

As for arresting officer Roy Wheeler, it is absolutely clear that his conduct was not in any way unlawful or unconstitutional. Officer Wheeler simply did his job by arresting Duffey for a valid reason and taking him to Cook County Jail. Once there, he helped process Duffey into the jail, then left and had no further contact with Duffey. He was not responsible for caring for the prisoners in

any way. Any responsibility Wheeler may have had in the way of reporting observations he had made of Duffey's condition was discharged when he spoke with Paul Hopson, who had at least as much opportunity to make the same observations. The court therefore finds no basis whatsoever for finding that Wheeler's conduct was clearly established to be an example of deliberate indifference, and, accordingly, he is entitled to qualified immunity.

### 2. Melissa Duke and Paul Hopson

■■■ The same cannot be said of defendants Duke and Hopson. Both were responsible for observing prisoners and handling any problems that arose. Both admit they were aware Duffey had stripped naked in his cell and had refused to eat for days at a time (Duke, at 47, 67; Hopson, at 40, 44, 47). Neither officer took the time to investigate personally to see if Duffey had begun eating. Duke also admits she heard Duffey preaching and barking like a dog (Duke, at 47). Hopson saw Duffey when he was admitted to the jail with his pants on inside out and wet (Hopson, at 44). Neither officer attempted to contact a doctor for a medical or psychiatric evaluation. In short, both officers were aware, or should have been, that Duffey was in great danger of harming himself, and neither did anything to prevent that harm or his subsequent death.

By the time Duffey was incarcerated in 1993, the Eleventh Circuit had held that it was clearly established that deliberate indifference to a prisoner's serious medical needs or providing an inmate with inadequate psychiatric care is cruel and unusual punish-

ment. *Greason v. Kemp,* 891 F.2d 829, 834 (11th Cir.1990) (citing *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)).[11] It may be that the holdings of *Estelle* and *Greason* alone are sufficient to clearly establish that Duke and Hopson were deliberately indifferent to Duffey's medical and/or psychiatric needs. It is hard to imagine how the defendant in *Greason*—whose conduct consisted of discontinuing an inmate's anti-depression medication without afterwards ensuring that the inmate was monitored for adverse effects—could be stripped of qualified immunity, without clearly establishing that Duke's and Hopson's conduct would also constitute deliberate indifference.[12]

But the court need not rely on those holdings alone. Shortly after *Estelle* was decided, the former Fifth Circuit, under facts similar to the present case, held that failure to contact a doctor or otherwise investigate after learning of an inmate's bizarre behavior and illness was sufficient to support a claim of cruel and unusual punishment. *Fielder v. Bosshard,* 590 F.2d 105, 108–109 (5th Cir. 1979).[13] The Eleventh Circuit had also held that failure to respond to a known medical problem, or providing grossly incompetent or inadequate medical care, constitute deliberate indifference to a prisoner's medical needs. *Ancata v. Prison Health Services, Inc.,* 769 F.2d 700, 704 (11th Cir.1985); *Rogers v. Evans,* 792 F.2d 1052, 1058 (11th Cir. 1986). It was absolutely clear that failure to respond to repeated warnings about an inmate's health problems, and failure to ensure that the inmate gets medical attention in the

11. *Estelle v. Gamble* dealt with an Eighth Amendment cruel and unusual punishment claim, which only applies after a prisoner has been found guilty, because until that time, the purpose of keeping someone in jail is to detain rather than to punish. However, the Eleventh Circuit has repeatedly held that " 'in regard to providing pretrial detainees with such basic necessities as food, living space, and medical care the minimum standard allowed by the due process clause is the same as that allowed by the eighth amendment for convicted persons.' " *Belcher v. City of Foley,* 30 F.3d 1390, 1396 (11th Cir.1994) (quoting *Hamm v. DeKalb County,* 774 F.2d 1567, 1574 (11th Cir.1985)).

12. For two examples of cases that found the "clearly established" requirement satisfied and denied qualified immunity without citing a previous case with similar facts, see *Powell v. M.C. Lennon,* 914 F.2d 1459, 1464 (11th Cir.1990) (relying primarily on *Estelle* to hold that failure to remove a prisoner from an area after learning the area was contaminated with asbestos constituted deliberate indifference), and *McMillian,* 88 F.3d at 1565.

13. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc) the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

face of such warnings, constitutes deliberate indifference. *Carswell v. Bay County,* 854 F.2d 454, 457 (11th Cir.1988). Finally, it was clearly established that "prison officials have an obligation to take action or to inform competent authorities once the officials have knowledge of a prisoner's need for medical or psychiatric care," and that subjective good faith does not guarantee that qualified immunity applies. *Waldrop v. Evans,* 871 F.2d 1030, 1036 (11th Cir.1989).

The court has thought long and hard about this case. *See Lassiter,* 28 F.3d at 1149. Given the decisions cited above, the court finds it absolutely inconceivable that Duke and Hopson could have reasonably believed their conduct in ignoring Duffey's bizarre behavior and the warnings that he was not eating was lawful under clearly established law. Even if Duke and Hopson honestly did not understand the nature of Duffey's problem and were acting in subjective good faith, their actions were not "reasonable" as required by *Anderson v. Creighton.* As the case law amply shows, the word reasonable implies a modicum of competence with regard to the requirements of the law and the duties of one's job. *Lassiter,* 28 F.3d at 1149 (holding that a plainly incompetent government actor is not entitled to qualified immunity) (citing *Malley v. Briggs,* 475 U.S. 335, 341–43, 106 S.Ct. 1092, 1096–97, 89 L.Ed.2d 271 (1986)). Any reasonable officer in either Duke's or Hopson's position would have made some effort, any effort, to ensure that Duffey either ate or got some form of medical or psychiatric care. Any reasonable officer would have at least checked on him after being told of the potential danger of Duffey's causing self-inflicted harm by not eating for a period of three days.[14] Any reasonable officer who heard Duffey barking like a dog and preaching would have at least looked in on him to see if perhaps he needed a psychiatric evaluation. Any reasonable officer would have noticed a prisoner under his care was unconscious, and would have procured some medical assistance before the prisoner died.

■ The very essence of qualified immunity is that it would be unfair and unwise to hold government officials personally liable unless they had advance notice that what they were doing was unlawful, *Lassiter,* 28 F.3d at 1152, or unless any competent officer placed in a similar position would have known as much. Any reasonable officer with a minimum amount of competence or concern for those under her care would have been able to recognize the danger and would have investigated or procured some form of medical care for Duffey. Previous cases clearly established that the failure of Duke and Hopson to do so was deliberate indifference. Accordingly, they are not entitled to qualified immunity.[15]

### 3. Sheriff Charles Bryant

■ Sheriff Charles Bryant never had contact with Duffey, and apparently spent little or no time at the jail during the eight days Duffey was incarcerated. Nevertheless, as sheriff, the operation of the jail and the safety of its inmates were in the end his responsibility. O.C.G.A. § 42–4–4(a)(2). Thus, although there is no respondeat superi-

---

**14.** In a factually similar case from another jurisdiction, the trial court denied qualified immunity to officers that failed to monitor an intoxicated prisoner who had gone without food and water for between twelve and twenty-three hours and was severely injured as a result. *Ringuette v. City of Fall River,* 888 F.Supp. 258, 269 (D.Mass. 1995).

**15.** The court is unpersuaded by defendants' argument that the jail suicide cases require the court to grant qualified immunity. Those cases require that the defendant was aware of the prisoner's suicidal tendency (i.e. the prisoner told the defendant he was going to attempt suicide, or had previously attempted suicide) in order to be held liable. *See Schmelz v. Monroe County,* 954 F.2d 1540, 1545 (11th Cir.1992) (quoting *Edwards v.*

*Gilbert,* 867 F.2d 1271, 1276 (11th Cir.1989), for the proposition that "the deliberate indifference standard is met only if there was a 'strong likelihood, rather than a mere possibility,' that self-infliction of harm would result."). The record contains no evidence that Duffey's refusal to eat was a conscious attempt to commit suicide rather than an unintended result of his mental illness.

Furthermore, these cases nearly always hinge on the defendant's knowledge, or at least recklessness, that the prisoner's life is in danger. Thus, in light of Duffey's strange behavior and the repeated warnings to Duke and Hopson that Duffey was not eating, to the extent that the jail suicide cases are applicable, they militate toward denying qualified immunity.

or liability in § 1983 actions, *Monell v. Dept. of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978), Sheriff Bryant may be held liable under § 1983 if plaintiff can demonstrate that he either personally participated in the acts comprising the alleged constitutional violation or adopted a policy that violated Duffey's constitutional rights. *Adams v. Poag,* 61 F.3d 1537, 1544 (11th Cir.1995) (citing *Hill v. Dekalb Regional Youth Detention Ctr.,* 40 F.3d 1176, 1192 (11th Cir.1994)).

The court finds that genuine issues of material fact remain as to both possibilities. First, because what he knew about Duffey's condition is disputed, Sheriff Bryant might be liable as a personal participant in the unconstitutional conduct. Duke says that Bryant called her on a number of occasions to ask who was yelling loudly and disturbing the other courthouse employees, and that she herself notified Bryant it was Duffey. Bryant, on the other hand, does not recall ever having heard of Duffey at all. If plaintiff can prove that Bryant was aware of Duffey's condition and failed to investigate or procure medical or psychiatric help, then he may be held liable for deliberate indifference under the same analysis as that applied to Duke and Hopson.

Second, Bryant might be liable as a supervisor by virtue of having in place an unconstitutional policy or custom, or for failing to adequately train his subordinates. There is evidence in the record suggesting that Bryant had in place a policy that inmates were given medical and/or psychiatric care only upon his approval. If plaintiff can demonstrate that this was in fact the policy of Cook County Jail, and that Sheriff Bryant was not available to approve such medical care if the need arose, then he might also be liable. Such a policy would in all likelihood constitute a de facto denial of adequate medical care amounting to deliberate indifference. *See Ancata,* 769 F.2d at 706. Finally, Sheriff Bryant might be held liable for failing to adequately train his employees, if the need for more training was obvious and was likely to result in the violation of constitutional rights. *Belcher,* 30 F.3d at 1398.

For these reasons, the court finds that genuine fact issues must be resolved before the court can decide whether Sheriff Bryant is entitled to qualified immunity.

### IV. Plaintiff's Motion for Summary Judgment

Plaintiff has also filed a motion for summary judgment as to all claims. The court finds that because there remain genuine issues of material fact to be determined, summary judgment is inappropriate at this time.

### CONCLUSION

Defendants' motion for summary judgment is **GRANTED IN PART.** Defendants are entitled to summary judgment as to all claims against the Board of Commissioners, Willie Batchelor, and Roy Wheeler, and all claims brought under the First and Eighth amendments. However, summary judgment is denied as to the § 1983 claims brought against Sheriff Bryant, Melissa Duke, and Paul Hopson. Also, the court finds that summary judgment on the issue of qualified immunity is denied as to Sheriff Bryant, and that Duke and Hopson are not entitled to qualified immunity as a matter of law. Plaintiff's motion for summary judgment is **DENIED IN FULL.**